**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Joseph Shea and Frankie Shea,<br><br>                                   Plaintiffs,<br><br>                    -v-<br><br>Town of Brookhaven, Theresa Trejo, and Amanda Paccione,<br><br>                                   Defendants. | 2:21-cv-5696<br>(NJC) (LGD) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

Plaintiffs Joseph Shea and Frankie Shea (together "Plaintiffs") initiated this action against Defendants Theresa Trejo and Amanda Paccione (the "Individual Defendants") and Defendant Town of Brookhaven (the "Town," and together "Defendants") on October 12, 2021. Plaintiffs bring claims against the Individual Defendants under 28 U.S.C. § 1983 ("Section 1983") and against the Town under Section 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for violations of the Fourth and Fourteenth Amendments to the United States Constitution. (Compl. ECF No. 1.) They also bring a Section 1983 claim against the Individual Defendants for conspiracy to violate Plaintiffs' Fourteenth Amendment rights to procedural due process and Fourth Amendment rights to protection from unreasonable seizures. (*Id.*)

Before the Court is Defendants' Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") (Not. Mot., ECF No. 40; Mem. L. Supp. Defs.' Mot. Sum. J. ("Mot."), ECF No. 40-18.) For the reasons set forth below, Defendants' Motion is granted in part and denied in part as follows.

Trejo is denied summary judgment on the Fourteenth Amendment claims challenging the deprivation of Plaintiffs' home and personal property without procedural due process and the Fourth Amendment claims against the alleged unlawful seizure of Plaintiffs' home and personal property. Moreover, Trejo is not entitled to qualified immunity on Plaintiffs' Fourteenth or Fourth Amendment claims because there are significant material disputes of fact regarding what she knew at the time she condemned Plaintiffs' home. A reasonable jury could conclude that it was not objectively reasonable for Trejo to believe that an imminent danger existed, based on clearly established law and the information she possessed when she ordered Plaintiffs to vacate the apartment.

By contrast, summary judgment is granted to Paccione on all claims because Plaintiffs have failed to show a genuine dispute of material fact as to whether Paccione was personally involved in the challenged conduct, specifically, the decisions to condemn their home and prevent them from returning to access their personal property. Likewise, summary judgment is granted to Trejo on Plaintiffs' conspiracy claim because Plaintiffs have not shown a dispute of material fact that Trejo and Paccione acted in concert to inflict an unconstitutional injury.

Finally, summary judgment is granted to the Town on the *Monell* claims based on custom and failure-to-train theories because Plaintiffs have failed identify any specific deficiency in training or to show a genuine dispute of material fact as to whether the challenged conduct was so pervasive and widespread such that it was the Town's standard operating procedure. By contrast, summary judgment is denied to the Town on the *Monell* claims based on a failure-to-supervise theory because the record gives rise to genuine disputes of material fact as to the elements of such claims.

**JURISDICTION**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the Complaint alleges violations of federal law under 42 U.S.C. § 1983. (Compl. ¶ 17.)

Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(2) because the alleged events took place in the Eastern District of New York. (Compl. ¶¶ 2, 18.)

**BACKGROUND**

**I.      Plaintiffs' Month-to-Month Tenancy**

On September 1, 2016, Plaintiffs Jospeh and Frankie Shea signed a month-to-month lease, terminable at will upon 30-days notice, with landlord Christopher Hansen at an address in Mastic Beach, New York. (Defs.' Ex. D ("Rental Agreement"), ECF No. 40-5; Pls.' Resp. to Defs.' Statement Material Facts ("CSMF") ¶ 10, ECF No. 42-10.) The property is a single-story Ranch-style dwelling that, during the period at issue, included two separate apartments, one on the first floor and a basement apartment comprised of two bedrooms, a living room, a kitchen, and a boiler room. (CSMF ¶¶ 2–3, 11.) A door connected the first-floor apartment with the basement apartment, but it remained locked from the first floor. (CSMF ¶ 16.)

During the relevant time period, Plaintiffs resided in the basement apartment with their three children. (CSMF ¶ 12; Rental Agreement.) It is undisputed that at least one of the bedrooms lacked any windows or means of egress because the door connecting the first floor and basement apartments was blocked. (CSMF ¶ 14.) Plaintiffs also admit that both Joseph and Frankie Shea smoked cigarettes outside and "when [Joseph Shea] would smoke, he would put [cigarette butts] on the ledge" inside the apartment. (F. Shea Dep. 38:2–6, ECF Nos. 40-3, 42-3, 42-4; *see also* Defs.' Ex. L ("Trejo Complaint") at 12, ECF No. 40-13 (including a picture with

3

cigarette butts on an indoor window ledge).)[1] Before the property was condemned, Plaintiffs had the intention to move into the first-floor apartment and use the entire property as their home. (CSMF ¶ 18.)

When Plaintiffs moved into the basement apartment, the first-floor apartment was occupied by Denny Maurte, Jose Ortiz, and their children. (F. Shea Dep. 23:2–25; *see also* CSMF ¶ 4.) Maurte, Ortiz, and their family resided in the first-floor apartment until they were evicted around the time of the condemnation of the property. (Christopher Hansen Dep. ¶¶ 8:4–9:12, ECF Nos. 40-2, 42-5.) The parties agree that the first-floor apartment was "maintained in an unsanitary condition, described as 'an episode of Hoarders without the hoarding part.'" (CSMF ¶ 6.) The Maurte-Ortiz family also smoked "a lot of cigarettes" inside, causing the walls to become discolored. (CSMF ¶ 5.) The first-floor apartment also had property damage in need of repair, including removed sheet rock and a hole in the wall covered only by a sheet of plywood. (CSMF ¶¶ 7–8.) It is undisputed that Plaintiffs did not reside in the first-floor apartment.

## II.    Condemnation of Plaintiffs' Home

On September 4, 2018, Dorothea Maute[2] sent an email to the Town requesting an inspection of a "downstairs apartment" because her daughter—presumably Denny Maurte—lived "upstairs" and Dorothea was "afraid of a fire." (ECF No. 40-6.) The email did not include

---

[1] In their Counter Statement of Material Facts, Plaintiffs dispute that cigarette butts were left inside the basement apartment, but fail to cite any evidence in the record. (*See* CSMF ¶ 15.) Additionally, in her deposition, Frankie Shea testified that Joseph Shea left cigarette butts "on the ledge" inside the basement apartment. (F. Shea Dep. 38:2–6.)

[2] The record shows that Dorothea Maute spells her last name differently than her daughter, Denny Maurte.

any explanation other than that the children in the downstairs apartment resided in a room without windows. (*Id.*) At that time, Plaintiffs had resided in the basement apartment on their month-to-month lease for a little more than two years. (F. Shea Dep. 15:13–20.)

The complaint was assigned to Defendant Town Investigator Amanda Paccione, who visited the property on September 12, 2018, and inspected the first-floor apartment. (CSMF ¶ 20.) Paccione made an effort to visit the basement apartment, but no one was present. (*Id.* ¶ 23.) The next day, Jose Ortiz, the occupant of the first-floor apartment filed a complaint with the Town, stating that the basement apartment was an illegal apartment. (ECF No. 40-8, CSMF ¶ 19.)

More than one month later, on October 24, 2018, Paccione returned to inspect the basement apartment. (CSMF ¶ 25.) That same day, the sheriff was sent to evict the first-floor tenants, Ortiz and Maurte, because they had not paid rent in two years. (Hansen Dep. 8:23–9:3.) When Paccione arrived, she called then-Senior Building Inspector Robert Incagliato and asked him to dispatch a building inspector. (CSMF ¶¶ 25–26.) Incagliato assigned Defendant Building Inspector Theresa Trejo to inspect the property. (CSMF ¶ 28.)

Frankie Shea was home when Paccione arrived and testified in her deposition that Trejo knocked on the door and gave Frankie Shea her card, saying that "there was mold in the house and [Frankie Shea's family] would have to leave." (F. Shea Dep. 42:15–43:13.) Frankie Shea testified in deposition that a few days earlier, Maurte had come downstairs with Paccione's card and said that there was mold in the property. (F. Shea Dep. 43:20–44:4) Frankie Shea did not "think much of it" because she thought Maurte and Ortiz were "just mad" that they were being evicted and "knew that the plan was for [the Shea family] to move upstairs." (*Id.*) Frankie Shea also testified that when Trejo arrived, Trejo said that the "house is not inhabitable" and "that's

5

really all she [could] tell [Frankie Shea]," but that the Shea family "might not be able to get back in because of the mold." (F. Shea Dep. 42:19–43:17.) According to Frankie Shea, Trejo called the police, gave Plaintiffs one hour to collect their belongings, and said that if the family did not leave the property they would be arrested and Trejo would "call CPS and get [Frankie Shea's] kids taken away, and [Plaintiffs] would go to jail." (*Id.* 43:13–44:11; *see also* J. Shea Dep. 13:21–14:22; Hansen Dep. 14:14–21.) By contrast, Trejo testified in deposition that she only "recommended" that Plaintiffs leave the property and gave them the option to remain in the residence. (Trejo Dep. 14:23–15:5, ECF Nos. 40-9, 50-1.)

At some point on October 24, 2018, Trejo and Paccione inspected each room of the basement apartment. (CSMF ¶ 36.) As a result of that inspection, Paccione issued five citations pertaining to the basement unit for alleged violations of the Brookhaven Town Code ("BTC"). (*See* CSMF ¶ 37.) Those were as follows:

- rental occupancy in a building lacking a rental registration, in violation of BTC § 82-10 (Defs.' Ex. I ("BTC Violations") at 1, ECF No. 40-10; *see also* CSMF ¶ 37(a));

- alteration of a basement into a separate residential dwelling without a building permit in violation of BTC § 85-12 (BTC Violations at 2; *see also* CSMF ¶ 37(b));

- occupancy of a basement unit for residential use without a certificate of occupancy in violation of BTC § 85-15 (BTC Violations at 3; *see also* CSMF ¶ 37(c));

- absence of "required operational smoke detectors and alarm devices" in violation of BTC § 82-6 (BTC Violations at 4; *see also* CSMF ¶ 37(d)); and

- "interior door from the basement to the main dwelling [being] blocked with no means of egress" in violation of BTC § 82-3 (BTC Violations at 6; *see also* CSMF ¶ 37(f)).

Paccione issued two additional citations for conditions in the first-floor apartment, including one for a "massive amount of mildew" in the master bedroom. (BTC Violations at 5, 7.)

In response to Plaintiffs' interrogatories, Trejo identified twenty-one safety violations in the upstairs apartment, including "mold on exterior wall" of a bedroom, mold in the dining room,

6

and "[s]ignificant mold in the bathroom." (Defs.' Ex. K ("Trejo Interrogatories") No. 7, ECF No. 40-12.) She also identified the following violations in the basement apartment: (1) no egress from two of the bedrooms, (2) no window in one of the bedrooms, (3) no smoke alarm in two of the bedrooms or in a hallway and no carbon monoxide alarm in a hallway, (4) lack of ventilation in one of the bedrooms and boiler room, (5) broken pipes and oil leak in the boiler room, (6) an electric panel lacking requisite clearance and showing signs of tampering, and (7) that the boiler room had been used as storage, restricting access to it. (*Id.*)[3] Trejo testified in deposition that she believed that in "one way or another" all of the basement apartment safety violations identified in her interrogatory response "present[ed] an imminent danger to the occupants" because each is a "major issue[]" prohibited by the New York State Property Maintenance Code ("NYSPMC"). (Trejo Dep. 11:4–12:10, 17:7–23, 19:13–20:25.)

Despite the large number of safety issues alleged by Trejo, according to Hansen and Frankie and Joseph Shea, the primary issue raised by Paccione and Trejo prior to the condemnation of the property was the allegation of mold in the master bedroom of the first-floor apartment—not the alleged safety violations in the basement. (*See* Hansen Dep. 10:16–19 (explaining the "main thing, which caused this whole thing was an accusation of mold"); F. Shea Dep. 43:5–17; J. Shea Dep. 14:23–15:16.) Moreover, Frankie Shea testified in her deposition that contrary to Trejo's claims, the basement contained four smoke alarms—one in each bedroom, one in the hallway, and one in the kitchen—and two carbon monoxide alarms. (F. Shea Dep. 32:23–33:18; *but see* Hansen Dep. 10:16–19 (admitting that Hansen replaced smoke detectors).)

---

[3] Defendants identify what they list as thirteen safety hazards in the basement apartment, but several are consolidated here for simplicity. (SMF ¶ 39.)

At some point on October 24, 2018, Defendants temporarily condemned the entire property pending implementation of five corrective measures: (1) a building permit for the finished basement, (2) a certificate of mold removal, (3) the repair and cleaning of the apartments, (4) installation of smoke and carbon monoxide alarms, and (5) Hansen's procurement of a rental permit. (CSMF ¶ 40.)[4] On October 26, 2018 and October 29, 2018, Trejo and Paccione submitted what are called "Complaint Reports" with the Town's Department of Law reporting on their findings. (*See* Defs.' Ex. J ("Paccione Complaint"), ECF No. 40-13; Trejo Complaint.)

Pictures attached to the Complaint Report preprepared by Trejo show that the Town posted at least eight pink condemnation notices on the property, one of which was posted on the pad-locked front door to the basement unit with yellow tape reading in all capital letters, "DO NOT CROSS OR TRESPASS BY ORDER OF THE TOWN OF BROOKHAVEN." (Trejo Complaint at 27–29.) Additionally, Hansen testified that when Defendants condemned the property, Trejo told him that "everyone has to leave and if you're seen on the property, you will get arrested." (Hansen Dep. 14:14–18.)

### III.    Plaintiffs' Basement Apartment is Repaired

As a result of the condemnation of the property, Plaintiffs were prohibited from occupying their basement apartment for somewhere between ten days and three weeks. The parties agree that the condemnation was lifted ten days after October 24, 2018, and Plaintiffs then occupied the entire property: both the basement and first floor. (CSMF ¶¶ 50, 52.) However,

---

[4] Plaintiffs dispute the statement set forth in paragraph 40 of Defendants' Rule 56.1 Statement on the sole basis that no mold was ultimately found. (CSMF ¶ 40.) They do not contest that these corrective actions were required to lift the condemnation of the property or that Defendants condemned the property pending receipt of a certificate of mold removal.

Joseph Shea testified in deposition that before returning home, Plaintiffs were forced to spend six days in a hotel and, when they could no longer afford to stay there, had to move in with Frankie Shea's mother for two weeks. (Jospeh Shea Dep. 29:4–20.)

It is undisputed that "[d]espite the temporary condemnation, if the Plaintiffs needed to re-enter the [basement apartment], they would contact the landlord and he would meet them there to assist with entry." (CSMF ¶ 45.) As a result, the parties agree that during the period when the property was condemned, Frankie Shea accessed the basement apartment on three occasions to retrieve personal property and Joseph Shea returned around five to six times to retrieve personal property. (CSMF ¶¶ 46, 48.) However, Hansen testified that Trejo "would show up and call the cops and tell us that we would get arrested for trespassing and then . . . before the cops got there, she would take off." (Hansen Dep. 14:18–23.)[5] Hansen further testified that after spending thousands of dollars testing for mold, testing showed that there was "no mold." (Hansen Dep. 10:21–25; CSMF ¶ 38.)

---

[5] Hansen testified as follows:

> Q: "You said you spoke to Theresa that day?"
>
> A: "Yes"
>
> Q: "What did she tell you?"
>
> A: "She was just horrible. She's above the law, she doesn't respect law enforcement, ex-law enforcement and she said that everyone has to leave and if you're seen on the property, you will get arrested, even myself, so for ten days after this was lifted, when I was at the house, whether it was myself, Joey and Frankie, she would show up and call the cops and tell us that we would get arrested for trespassing and then . . . before the cops got there, she would take off."

(Hansen Dep. 14:10–23.)

9

Trejo also admitted to, and was captured on video, returning to the property on an unknown date with Paccione but without Plaintiffs present. (Trejo Dep. 43:9–48:7). According to Trejo, one of those videos showed her "going in" Plaintiffs' refrigerator. (*Id.* 48:8–10.) Additionally, a neighbor, Angelo Grella, testified that on an unknown date, she saw a woman with "blondish hair" who was a "little heavy" and said her name was "Amanda" use a water hose apparently to fill the oil tank on the property with water. (Grella Dep. 11:15–16:19.) When Grella confronted the woman and asked "what was going on," the woman said that she was "closing down the house and the house was being condemned," and "it was none of [Grella's] business and to turn around and get back on [her] property." (*Id.* 11:22–12:4.)

## IV. Plaintiffs Return to the Basement Apartment to Find It Vandalized

Plaintiffs allege that when they eventually returned to the property after it was no longer condemned, they found their home vandalized. Frankie Shea testified that "everything was literally soaking wet" because it appeared that someone had opened the drain to the boiler, flooding the apartment. (F. Shea Dep. 102:5–7.) As a result, a couch and dresser in the home were destroyed and had to be replaced, each costing around $2,000 according to Frankie Shea. (F. Shea Dep. 78:10–79:10.) Hansen also testified to the water damage, stating in his deposition that while the property was condemned, someone filled the oil tank with water, and he had to pay someone to come out and remove the water in order for the heating system to work again. (Hansen Dep. 15:13–25.) Finally, Frankie Shea's wedding band and engagement ring were also missing from her dresser, as were several articles of clothing, and several laptops. (F. Shea Dep. 75:5–78, 81:7–11.)

V.     **Subsequent Events**

On March 28, 2019, a conditions of discharge form was filed in a state court case connected to the condemnation. (*See* ECF No. 40-15.)

Plaintiffs filed this action against Defendants in 2021. Subsequently, Incagliato was deposed about his experience working with Trejo in a different case, *Spradley v. Town of Brookhaven*, No. 19-cv-175 (E.D.N.Y. Mar. 28, 2022). Incagliato admitted to receiving complaints about Trejo but "never took them" and instead forwarded the complaints to Deputy Town Attorney David Moran. (Incagliato Dep. 29:6–31:25.) Incagliato also acknowledged that he "had heard that [Trejo] had been known to violate people's rights" in "other people's opinions" but he did not "recall checking on anything she ever did." (*Id.* 41:10–25).) Instead, he testified that he tried to "stay away[] from her" because he had questioned Trejo's timesheet and was told by Moran "not to bother [Trejo]." (*Id.* 29:6–14.)

## PROCEDURAL HISTORY

Plaintiffs filed the Complaint in this action on October 12, 2021. (Compl.) The case was originally assigned to District Judge Joan M. Azrack. (Elec. Order Oct. 14, 2021.) The Complaint brings the following claims against the Individual Defendants: (1) three Section 1983 claims—Fourteenth Amendment procedural due process, Fourth Amendment unlawful seizure, and conspiracy to violate Plaintiffs' Fourth and Fourteenth Amendment rights; and (2) three state law claims—intentional infliction of emotional distress, negligence, and abuse of process. (Compl.) The Complaint also brings a Section 1983 *Monell* claim against the Town for violation of Plaintiffs' Fourteenth and Fourth Amendment rights and a state law claim for respondeat superior. (*Id.*) However, on March 14, 2022, Plaintiffs filed a stipulation to dismiss all state law

11

claims against both the Individual Defendants and the Town, which the Court so ordered on March 15, 2022. (ECF Nos. 14–15.)

On April 3, 2023, Defendants timely filed a letter, pursuant to Judge Azrack's Individual Rules, seeking a conference in anticipation of filing a summary judgment motion. (ECF No. 21.) Plaintiffs timely filed an opposition on April 24, 2023. (ECF No. 22.) On October 10, 2023, the case was reassigned to my docket. (Elec. Order, Oct. 10, 2023.) Because Defendants' pre-motion conference letter was still pending, I denied the letter motion with leave to refile in accordance with my Individual Rules.

On November 7, 2023, Defendants filed a second letter seeking a conference in anticipation of filing a summary judgement motion, this time with a supporting Rule 56.1 Statement of Undisputed Facts and supporting exhibits. (ECF No. 28.) Plaintiffs timely filed an opposition letter and Rule 56.1 Counterstatement of Facts on December 1, 2023. (ECF No. 32.) After reviewing the parties' filings, I waived Defendants' request for a pre-motion conference and set a briefing schedule on Defendants' anticipated motion for summary judgment. (Elec. Order, Jan. 9, 2024.) Pursuant to the briefing schedule and the Court's recommended bundling practice, the parties filed their submissions on Defendants' Motion for Summary Judgement on March 26, 2024. (Not. Mot.; Mot.; Mem. L. Opp'n Defs.' Mot. Summ. J. ("Opp'n"), ECF No. 42-11; Reply Mem. L. Supp. Defs.' Mot. Summ. J. ("Reply"), ECF No. 41-3.)

Along with its motion, Defendants filed a Memorandum in Support, a Rule 56.1 Statement of Material Facts ("SMF") (SMF, ECF No. 40-17), and the declaration of its counsel, Alexander E. Sendrowitz (ECF No. 40-1), with the following attached exhibits:

- excerpts from the deposition transcripts of Hansen (ECF No. 40-2), Frankie Shea (ECF No. 40-3), Joseph Shea (ECF No. 40-4), Paccione (ECF No. 40-7), and Trejo (ECF No. 40-9);

- the Rental Agreement between Hansen and Plaintiffs (ECF No. 40-5);

- the September 4, 2018 email from Dorothea Maute to the Town (ECF No. 40-6);

- the September 13, 2018 complaint filed by Jose Ortiz with the Town (ECF No. 40-8);

- the Brookhaven Town Code violation sheets from *The People of New York v. Christopher Hansen*, District Court of the State of New York Suffolk County Sixth District (ECF No. 40-10);

- the Paccione and Trejo Complaint Reports (ECF Nos. 40-11, 40-13);

- Trejo's responses to Plaintiffs' interrogatories (ECF No. 40-16);

- the Complaint initiating this action (ECF No. 40-14); and

- the Conditions of Discharge form from *The People of New York v. Christopher Hansen*, District Court of the State of New York, Suffolk County, Sixth District (ECF No. 40-15).

Plaintiffs filed a Memorandum in Opposition ("Opp'n") and Plaintiffs' Counterstatement of Facts ("CSMF") (CSMF, ECF No. 42-11), with the following attached exhibits:

- excerpts from the deposition transcripts of Incagliato (ECF No. 42-1), Hansen (ECF No. 42-2), Grella (ECF No. 42-7), Jospeh Shea (ECF No. 42-8), and Paccione (ECF No. 42-9);

- two excerpts from the deposition transcripts of Frankie Shea, one of which is mislabeled as the deposition of Trejo (ECF Nos. 42-3, 42-4);[6]

- an affidavit signed by Lisa Robinson (ECF No. 42-5); and

- a copy of the Brookhaven Town Code, Chapter 73 (ECF No. 42-6).

Defendants filed a Reply Memorandum of Law in Support of their Motion for Summary Judgment, a Response to Plaintiffs' Counterstatement ("CSMF Resp.," ECF No. 41-2), and a copy of a decision of another judge of this District in *Bonner v. Town of Brookhaven*, No. 22-cv-

---

[6] Plaintiffs filed a corrected exhibit containing Trejo's deposition on August 18, 2025. (*See* ECF No. 50.)

4690, 2023 WL 6812276, at *3 (E.D.N.Y. Oct. 16, 2023). Defendants' Motion is therefore fully briefed.

Following the close of briefing, I heard argument on the Motion on March 7, 2025, and referred the case to mediation. (Min. Entry, Mar. 7, 2025; Elec. Order, Mar. 7, 2025.) On May 30, 2025, Plaintiffs filed a status report indicating that the parties were unable to resolve the action. (ECF No. 49.) Defendants' Motion for Summary Judgement is therefore ripe for review.

As of the date of this Order, I am aware of at least four other cases brought by Plaintiffs' counsel in which judges of this District have ruled on either a motion to dismiss or a motion for summary judgement for claims arising out of the Town of Brookhaven's condemnation of residential property and/or removal of individuals from a residential property under analogous circumstances. In one additional case, dispositive motion practice has not yet occurred.[7]

## LEGAL STANDARDS

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a material question of fact. *Balderramo v. Go N.Y. Tours Inc.*, 668 F. Supp. 3d 207, 219 (S.D.N.Y. 2023) (citing *Celotex*

---

[7] The Complaint identifies three of these cases brought against the Town of Brookhaven: (1) *McCrae v. Town of Brookhaven*, 759 F. Supp. 3d 372 (E.D.N.Y. 2024); (2) *Perkowski v. Town of Brookhaven*, No. 18-cv-5480, 2021 WL 4408047 (E.D.N.Y. Sept. 27, 2021); and (3) *Spradley v. Town of Brookhaven*, No. 19-cv-175 (E.D.N.Y.). (Compl. ¶¶ 44–46.) The court's Memorandum and Order in *McCrae* identifies the two other factually analogous cases: (4) *Bonner*, 2023 WL 6812276; and (5) *Corrigan v. Town of Brookhaven*, No. 22-cv-4688, 2023 WL 7003936 (E.D.N.Y. Oct. 24, 2023).

In *Perkowski*, a jury found that Incagliato unlawfully seized a plaintiff's property and awarded compensatory damages. *See* Verdict Sheet (ECF No. 86), *Perkowski*, 18-cv-5480. *McCrae* was settled and dismissed. *McCrae*, 18-cv-7061, ECF Nos. 120, 122. The other three cases remain ongoing.

14

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).[8] "A fact is material if it might affect the outcome of the suit under the governing law." *Cunningham v. Cornell Univ.*, 86 F.4th 961, 980 (2d Cir. 2023), *rev'd on other grounds*, 145 S. Ct. 1020 (2025) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of "material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In order to defeat summary judgment, the non-moving party must set forth sufficient facts showing that there is a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c). The non-moving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010); *see also Daly v. Westchester Cnty. Bd. of Legislators*, No. 23-cv-1220, 2024 WL 3264125, at *2 (2d Cir. July 2, 2024) (summary order). "Mere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks*, 593 F.3d at 166.

A court considering whether summary judgment is appropriate "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Cunningham*, 86 F.4th at 980; *see also Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 939 (2d Cir. 2024) ("We may find for the movant defendant only if we conclude that on the record presented, considered in the light most favorable to the non-movant plaintiff, no reasonable jury could find in the plaintiff's favor."). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a

---

[8] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

## DISCUSSION

As explained, Plaintiffs bring Section 1983 claims against all Defendants under the Fourth and Fourteenth Amendments and a Section 1983 conspiracy claim against the Individual Defendants for violation of Plaintiffs' Fourth and Fourteenth Amendment rights. (*See* Compl.) Plaintiffs bring the Fourth and Fourteenth Amendment claims against the Town under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), on the basis that the Town allegedly engaged in a policy and custom of "illegal and biased administration of law and services" and failed to "adequately train, direct, supervise or control defendants so as to prevent . . . the violation of plaintiffs' constitutional rights." (Compl. ¶ 66–67.)

At the outset, I note that due to significant deficiencies in the Complaint and the motion papers submitted by both parties, it is difficult to discern the precise theories on which Plaintiffs allege that Defendants violated their Fourth and Fourteenth Amendment rights. The Complaint asserts in a single cause of action labeled "violation of civil rights," that "[b]y illegally evicting all plaintiffs thus seizing their home and personal property, defendants have deprived plaintiffs of their rights as guaranteed by the Fourth, Eighth, and Fourteenth Amendments." (Compl. ¶ 56.) However, the Complaint fails to clarify the theory underlying Plaintiffs' Fourth, Eighth, and Fourteenth Amendment claims, and the briefing submitted by both parties is similarly unclear. (*See* Compl.; Mot. at 2–12; Opp'n at 3–7.) The Complaint also fails to explain what the Town's alleged policy of "illegal and biased administration of law and services" entailed. (*Id.* ¶ 67.)

Nevertheless, I have closely reviewed the Complaint and the parties' submissions, and discern the following Fourth and Fourteenth Amendment claims: (1) that Defendants condemned

Plaintiffs' home without providing a pre-deprivation hearing in violation of the Fourteenth Amendment right to procedural due process; (2) that Defendants boarded up Plaintiffs' home, thereby depriving them of their personal property, without providing a pre-deprivation hearing in violation of the Fourteenth Amendment right to procedural due process; (3) that Defendants unreasonably seized Plaintiffs' home in violation of the Fourth Amendment; and (4) that Defendants unreasonably seized Plaintiffs' personal property by evicting them from their home and preventing them retrieving their belongs without a warrant or exigent circumstances in violation of the Fourth Amendment. As a result, I construe Plaintiffs' conspiracy claims to allege that the Individual Defendants engaged in a conspiracy to commit these same four violations. I construe the *Monell* claims to allege that the Town has a policy of condemning and boarding up homes without providing a pre-deprivation hearing in violation of the Fourth and Fourteenth Amendments.

For the reasons that follow, Trejo is denied summary judgment on the Fourteenth Amendment claims challenging the deprivation of Plaintiffs' home and personal property without procedural due process and the Fourth Amendment claims against the alleged unlawful seizure of Plaintiffs' home and personal property. Summary judgment is also denied to the Town on the *Monell* claims asserting a failure-to-supervise theory.

However, summary judgment is granted to Defendants on each of Plaintiffs' remaining claims. Although the facts in the record might potentially support additional theories for bringing a Fourth or Fourteenth Amendment claim beyond those identified here—including theories stemming from the post-deprivation process that Plaintiffs were afforded for retrieving their property and for the alleged vandalization of Plaintiffs' property—Plaintiffs do not adequately allege or develop such claims, and they are therefore abandoned. *See Bryant v. Steele*, 462 F.

Supp. 3d 249, 270 (E.D.N.Y. 2020) ("A party abandons a claim in the context of a summary judgment motion when she does not respond to arguments concerning that claim."), *aff'd sub nom. Bryant v. Iheanacho*, 859 F. App'x 604 (2d Cir. 2021). To the extent that the Complaint brings an Eighth Amendment claim, that claim is also abandoned because Plaintiffs entirely fail to address it in their briefing. (*Id.*)

## I.   The Operative Building Codes

The parties dispute which building codes were enforced by the Individual Defendants when Trejo condemned Plaintiffs' home. Plaintiffs argue that "Chapter 73 of the Brookhaven Town Code," and specifically Section 73-14, provides the "authority and procedures to order Town of Brookhaven residents to vacate their home due to imminent danger." (CSMF ¶ 63; Opp'n at 6–7.) Defendants disagree and correctly point out that BTC Section 73-1 provides that the code serves to enforce the New York Fire Prevention and Building Code, which itself incorporates the New York State Property Maintenance Code. Pl.'s Ex. 6 ("BTC") § 73-1, ECF No. 42-6; Mot. at 5; N.Y. Comp. Code R. & Regs. § 1226.1. The NYSPMC applies to all residential structures in New York and, in the event of a conflict, it supersedes local law. *See Breon v. Perales*, No. 6:15-cv-6335, 2015 WL 7289399, at *1–3 (W.D.N.Y. Nov. 16, 2015) (discussing N.Y. Comp. Code R. & Regs. § 1226.1 and N.Y. Exec. L. § 383(3)).

Accordingly, both the NYSPMC and the Brookhaven Town Code govern Defendants' condemnation authority. Three code provisions are relevant here.

Defendants rely upon NYSPMC Section 107.1. (*See* Mot. at 5.) It is titled "Unsafe Structures and Equipment" and provides that when the "authority having jurisdiction" determines during an inspection that a premises "constitutes a clear and imminent threat to human life, safety or health," the jurisdiction "shall exercise its powers *in due and proper*

18

*manner*" to protect the public where a structure is unsafe, unlawful, or unfit for human occupancy, or where unsafe equipment is present. NYSPMC § 107.1 (emphasis added).[9] Sections 107.1.1 through 107.1.4 further define "unsafe equipment" and structures that are "unsafe," "unlawful," or "unfit for human occupancy." NYSPMC §§ 107.1.1 through 107.1.4. Section 107.1 does not include any provisions concerning the procedures required before it is enforced, but Section 103.2.1 provides that in "cases of imminent danger," condemning a structure and removing occupants "without first providing an opportunity to be heard shall be permitted to the extent consistent with applicable Constitutional provisions, provided that the affected persons . . . are afforded the opportunity for a post-action hearing." NYSPMC § 103.2.1.

By contrast, Plaintiffs primarily rely upon BTC Section 73-14 in their Opposition. (*See* Opp'n at 5–6.) It is materially indistinguishable from NYSPMC § 108.1. Both appear within a Section or Chapter titled "Emergency Measures" and "authorize[]" an official "to order and require the occupants to vacate premises" in four circumstances:

(1) where there is an "imminent danger of failure or collapse of a building,"

(2) when a fallen structure endangers life,

(3) where "there is actual or potential danger to the building occupants or those in the proximity of any structure because of explosives, explosive fumes or vapors, or the presence of toxic fumes, gases or materials"; and

(4) where there is "operation of defective or dangerous equipment."

NYSPMC § 108.1; Brookhaven Town Code 73-1.

---

[9] Although Defendants cite to the NYSPMC throughout their Motion, neither party submits the NYSPMC as an exhibit. As a result, I take judicial notice of the NYSPMC, which appears online at International Property Maintenance Code, Property Maintenance Code of New York State 2020, https://up.codes/viewer/new_york/ny-property-maintenance-code-2020.

Trejo testified that BTC Section 73-14 governs structures considered for demolition and therefore did not apply to Plaintiffs' home. (Trejo Dep. 19:5–20:2.) Instead, according to Trejo, she condemned Plaintiffs' home based on the NYSPMC provisions governing "unsafe structure[s]." (*Id.* 19:5–20:2, 20:19–22.) Trejo also testified that the NYSPMC provisions on which she relies in condemning buildings were numbered Sections "108.1.1, 10.8.1.2" in the 2018 version of the code. (Trejo Dep. 20:23–25.) However, no party has provided the 2018 NYSPMC to the Court, and the 2019 NYSPMC does not contain a Section "108.1.1" or "108.1.2." Trejo's description of the provisions on which she relied is consistent with NYSPMC Section 107.1.1. *See* NYSPMC § 107.1.1. Accordingly, interpreting the facts in the light most favorable to Plaintiffs, this testimony serves as an admission that Trejo did *not* consider NYSPMC Section 108.1—the code provision providing for emergency orders to vacate—when condemning Plaintiffs' home.

Accordingly, drawing all reasonable inferences in favor of Plaintiffs as required when evaluating Defendants' motion for summary judgment, Trejo necessarily relied on NYSPMC Section 107.1 and did not consider BTC Section 73-14 or the materially identical NYSPMC Section 108.1 when she determined that Plaintiffs' home should be condemned. *Cunningham*, 86 F.4th at 980.

## II.    Fourteenth Amendment Claims

Defendants move for summary judgement on Plaintiffs' Fourteenth Amendment claims. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. This guarantee protects rights to procedural and substantive due process. *See Nnebe v. Daus*, 931 F.3d 66, 80, 89 (2d Cir. 2019).

The Complaint generally pleads that "[b]y illegally evicting all plaintiffs thus seizing their home and personal property," Defendants violated Plaintiffs' Fourteenth Amendment rights, without specifying whether the deprivation concerns procedural or substantive due process. (Compl. ¶ 56.) Defendants' moving brief presupposes that the claim is for procedural due process. (*See* Mot. at 2–12.) In opposition, Plaintiffs do not argue that the Complaint pleads substantive due process in addition to procedural due process. (Pls.' Opp'n at 3–7.) Plaintiffs have therefore abandoned any substantive due process claim. *See Bryant*, 462 F. Supp. 3d at 270.

A Section 1983 procedural due process claim is "composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022); *Nnebe*, 931 F.3d at 80. As explained, the Complaint asserts two procedural due process claims: (1) that Defendants condemned Plaintiffs' home and ejected them from their basement apartment without a pre-deprivation hearing (Compl. ¶ 34); and (2) that in evicting Plaintiffs from their home, Defendants deprived Plaintiffs of their personal property located in the basement apartment without pre-deprivation opportunity to be heard (Compl. ¶ 41).

With respect to the procedural due process claims, summary judgment is warranted for Paccione but not Trejo. Plaintiffs have shown that a reasonable jury could conclude that Trejo deprived Plaintiffs of their protected property interests in residing in their home and accessing their personal property without a pre-deprivation hearing in violation of the Fourteenth Amendment. Nor is Trejo entitled to qualified immunity on these claims. There are material disputes of fact from which a reasonable jury could conclude that it was not objectively reasonable for Trejo to believe that she acted lawfully, based on clearly established law and the information she possessed. However, Plaintiffs have failed to show a dispute of material fact as

to whether Paccione was personally involved in any deprivation of their protected property interest in their home or personal property as required for a procedural due process claim. Finally, although there are facts in the record related to the post-deprivation procedures afforded to Plaintiffs in retrieving their personal property, Plaintiffs neither bring a procedural due process claim stemming from those procedures nor do they cite the legal standards governing such a claim.

     A.  <u>Protected Property Interest</u>

"In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald*, 280 F.3d 159, 173 (2d Cir. 2001); *see also Grand Medford Ests., LLC v. Town of Brookhaven*, No. 24-402-CV, 2024 WL 4440231, at *2 (2d Cir. Oct. 8, 2024) (same) (summary order). Property interests "are typically not created by the Constitution, but instead by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Radwan*, 55 F.4th at 124–25 (citing *Goss v. Lopez*, 419 U.S. 565, 572–73 (1975)). Protected property interests "extend well beyond actual ownership of real estate, chattels, or money" and encompass "so-called 'new property' rights," including governmental benefits conferred by statute or contract. *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 965–66 (2d Cir. 1988). For example, the Supreme Court has recognized property interests in the receipt of welfare benefits under statutorily defined eligibility criteria and in public employment where a person is dismissed during the term of their employment contract or where the person either holds a position with tenure protections or was hired with a "clearly implied promise of continued employment." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576–77 (1972) (collecting cases).

In assessing whether an interest constitutes a protected property interest, courts "focus on the applicable statute, contract or regulation that purports to establish the" property interest. *Grand Medford Ests., LLC v. Town of Brookhaven*, No. 24-402, 2024 WL 4440231, at *2 (2d Cir. Oct. 8, 2024) (quoting *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994)). The plaintiff "must have more than an abstract need or desire" for the "benefit" at issue and must "have a legitimate claim of entitlement" to the benefit for it to be afforded procedural due process protection. *Roth*, 408 U.S. at 577. For example, in *Roth*, the Supreme Court held that a professor did not have a protected property interest in re-employment for the subsequent school year where the contract "specifically provided that [his] employment was to terminate" on a specified date and did not include any renewal provisions. *Id.* at 578.

The Supreme Court has long recognized that a tenant's "continued residence in their home[]" is a "significant interest in property," entitling the tenant to adequate opportunity to be heard prior to an eviction. *Greene v. Lindsey*, 456 U.S. 444, 450–51 (1982). It has also held that a "possessory interest" in household goods "dearly bought and protected by contract" is "sufficient to invoke the protection of the Due Process Clause." *Fuentes v. Shevin*, 407 U.S. 67, 86 (1972); *Alexandre v. Cortes*, 140 F.3d 406, 411 (2d Cir. 1998) (same); *see, e.g.*, *Bray v. City of New York*, 346 F. Supp. 2d 480, 489 (S.D.N.Y. 2004) (recognizing a protected property interest in a bicycle).

Plaintiffs' claim that the Town seized their "home and personal property without providing them with a pre-deprivation hearing" (Opp'n at 3) amounts to the assertion that Defendants' conduct implicated two separate, protected property interests: (1) Plaintiffs' use and occupancy of their home, stemming from the month-to-month tenancy created by the September 1, 2016 rental agreement between Plaintiffs and Hansen (Rental Agreement); and (2) Plaintiffs'

23

interest in the "continued possession and use" of their personal property located inside the home, *Fuentes*, 407 U.S. at 86. Defendants contest that Plaintiffs had the first asserted property interest, arguing that a "month-to-month tenancy, terminable at will by the service of a thirty-day notice cannot give rise to a 'legitimate claim of entitlement' to remain in possession.'" (Mot. at 3 (quoting *United States v. Schmitt*, 999 F. Supp. 317, 361 (E.D.N.Y. 1998).) They do not, however, challenge that Plaintiffs had a property interest in the possession and use of their personal property, which was located in the condemned home.[10]

At the time of Plaintiffs' eviction on October 24, 2018, under New York law, a "tenancy from month to month . . . may be terminated by the landlord or the tenant upon his notifying the other *at least* one month before the expiration of the term of his election to terminate." N.Y. Real Prop. Law § 232-b ("Section 232-b") (McKinney 2018). The parties agree that Plaintiffs' tenancy was "terminable at will upon 30-day[s] notice." (SMF ¶ 10; CSMF ¶ 10.) That framing is somewhat of an oversimplification of New York Real Property Law Section 232-b, which explicitly requires that notice of termination of a month-to-month tenancy be given "*at least* one month before the *expiration of the term* . . . ." N.Y. Real Prop. Law § 232-b (McKinney 2018) (emphasis added). Therefore, under Section 232-b, a tenancy does not terminate in exactly 30 days from the provision of notice; rather, upon the provision of notice, the tenancy will terminate at the end of the next monthly term such that the tenant was given *at least* one month's notice. *See id*. According to the plain text of the statute, had Plaintiffs' landlord sought to terminate the lease on October 24, 2018 (the date of eviction), Plaintiffs would have nevertheless retained a valid lease until the end of the following month: November 30, 2018.

---

[10] Such a challenge would be unpersuasive in light of *Fuentes*, 407 U.S. at 86, which clearly recognizes a protected property interest in household goods giving rise to due process protection.

The Second Circuit has not addressed whether a month-to-month tenancy creates a protected property interest under the Fourteenth Amendment. Under New York law, a lease is "both a conveyance of an interest in property and a contract." *Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696, 705 (S.D.N.Y. 2014). Thus, Plaintiffs had a protected property interest in residing in their home for the duration of their lease, which is an interest analogous to the "actual ownership of real estate, chattels, or money." *S & D Maint. Co.*, 844 F.2d 962, 965–66 (2d Cir. 1988).

Defendants' reliance on *Roth*, 408 U.S. at 571–72, and its progeny—cases that concern welfare benefits and public employment—is unpersuasive in light of the longstanding principle that residence in one's home is a "significant interest in property," *Greene*, 456 U.S. at 450–51. Moreover, "[t]he Fourteenth Amendment's protection of 'property' . . . has never been interpreted to safeguard only the rights of undisputed ownership" but also includes property to which an individual lacks "legal title." *Fuentes*, U.S. at 87; *see also Radwan*, 55 F.4th at 126–28 (holding that a one-year athletic scholarship is a protected property interest in part because the recipient relies upon it as an "exclusive source of funding for housing" and other needs).

Accordingly, several courts outside the Second Circuit have interpreted state law and held that "*any* tenancy creates a property interest" protected by due process. *Ruiz v. New Garden Twp.*, 376 F.3d 203, 207 (3d Cir. 2004) (emphasis in original) (considering a month-to-month lease under Pennsylvania law); *Ward v. Downtown Dev. Auth.*, 786 F.2d 1526, 1528–529 (11th Cir. 1986) (holding that Florida law governing a "month-to-month tenancy at will" gives rise to a property interest protected by the Fifth Amendment Due Process Clause); *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (holding that Florida law also gives rise to a "constitutionally-protected property interest in [a tenant's] continued residency" under the

25

Fourteenth Amendment Due Process Clause (citing *Ward*, 786 F.2d at 1528)); *Forcier v. Binette*, No. 16-cv-121S, 2017 WL 979028, at *6 (D.R.I. Jan. 18, 2017), *report and recommendation adopted*, No. 16-cv-121 S, 2017 WL 963188 (D.R.I. Mar. 13, 2017) ("Equally well settled is that a tenancy of some duration, however short, may create a constitutionally-protected property interest").

Even under the standards that govern "so called 'new property' rights," Plaintiffs' month-to-month lease created a "legitimate claim of entitlement" to occupy the residence until at least one month following the provision of notice that their monthly tenancy would expire. *S & D Maint. Co.*, 844 F.2d at 965–66. Under this line of cases, courts first consider whether the interest at issue "is protected under state law and weigh the importance to the holder of the right." *Radwan*, 55 F.4th at 125; *Ezekwo*, 940 F.2d at 783. An "ordinary contract right" is "qualitatively different" from a property interest "characterized by a quality of . . . extreme dependence." *S & D Maint. Co.*, 844 F.2d at 966 (emphasis added). Thus, protected property interests have been found where a statute protects interests relied upon by "our poorest citizens to provide for their immediate well-being, if not survival." *Id.* at 966. Second, courts consider the degree of "permanence" associated with the interest. *Radwan*, 55 F.4th at 127. Where a person expects to retain a benefit or property interest "over a fixed period, [it] endgender[s] the type of reliance protected by due process." *Id.* at 127. Significantly, "either [dependence or permanence] may be sufficient for a constitutionally protected property interest to arise." *Id.*

Applying these principles, Section 232-b creates a constitutionally protected property interest in Plaintiffs' tenancy in the basement apartment until the end of November 2018—the month that followed the month in which the unit was condemned. N.Y. Real Prop. Law § 232-b. Month-to-month tenancies are both protected by New York law and characterized by a quality of

26

"extreme dependence" since eviction can leave a family unhoused. *S & D Maint. Co.*, 844 F.2d at 966; *see also Greene*, 456 U.S. at 450–51 (recognizing a tenant's "significant interest" in continued residence in their home); *Davis v. New York City Hous. Auth.*, 379 F. Supp. 3d 237, 253–54 (S.D.N.Y. 2019) (holding that public housing leases constitute "property interests for purposes of due process claims"). Indeed, here, Plaintiffs lived in the subject property for more than two years. (F. Shea Dep. 15:13–20.) Upon eviction, Plaintiffs spent six days in a hotel and then, when they could no longer afford to do so, moved in with Frankie Shea's mother for two more weeks before returning to the subject property. (J. Shea Dep. 29:4–20.)[11] Moreover, Section 232-b protected Plaintiffs' tenancy for a "fixed period"—until at least November 30, 2018—engendering the type of reliance protected by due process. *Radwan*, 55 F.4th at 125–26. Plaintiffs had a reasonable expectation of remaining in their basement apartment until November 30, 2018, just as the plaintiff in *Radwan* had a constitutionally protected interest in retaining a fixed, one-year athletic scholarship that was cut six-months short, notwithstanding a provision permitting immediate reduction or cancellation of the scholarship for misconduct. *Id.* at 125–27 (emphasis added).

Defendants' arguments that Plaintiffs lack a constitutionally protected property interest in residing in the basement apartment until the end of November 2018 are unpersuasive. Defendants incorrectly assert that another court in this District previously held that month-to-month tenancies are not constitutionally protected. (*See* Mot. at 3–4 (citing *United States v.*

---

[11] Despite this testimony, in their response to Defendants' Rule 56.1 Statement, Plaintiffs admit that it is undisputed that the "condemnation was lifted after a duration of ten (10) days." (CSMF ¶ 50.) Reading the facts in the light most favorable to Plaintiffs, Plaintiffs were unable to return to the basement apartment for at least ten days and possibly for more than two weeks after it was condemned.

*Schmitt*, 999 F. Supp. 317, 361 (E.D.N.Y 1998)).) Rather, decisions in this District have recognized that a month-to-month tenancy can give rise to a property interest afforded due process protection. For example, in *Valdez v. Town of Brookhaven*, No. 05-cv-4323, 2005 WL 3454708 at *9 (E.D.N.Y. Dec. 15, 2005), another judge of this District held that the "general principle" that monthly payment of rent establishes a valid property interest in a month-to-month tenancy "is undisputed," relying on the majority and concurring opinions in *Ruiz v. New Garden Township*, in which the Third Circuit held that "*any* tenancy creates a property interest" under Pennsylvania law. 376 F.3d 203, 207 (3d Cir. 2004).[12] Defendants' assertion rests on a misreading of two decisions: *Schmitt*, 999 F. Supp. at 361 and *Okolie v. Paikoff*, 589 F. Supp. 2d 204, 215 (E.D.N.Y. 2008). Both cases are readily distinguishable.

In *Okolie*, the district court held only that a month-to-month *commercial* tenancy does not create a "legitimate claim of entitlement to remain in possession *after notice of termination.*" 589 F. Supp. 2d at 215. The commercial tenancy at issue in that action is clearly distinguishable from Plaintiffs' interest in residing in the apartment they had lived in for two years and were legally entitled to inhabit until at least November 30, 2018. Furthermore, Plaintiffs in this action do not assert an interest in residing in the basement apartment *after* the conclusion of their month-to-month tenancy. (Opp'n at 4–5.) Rather, Defendants permitted Plaintiffs to return to the apartment ten days, or at most, two weeks later. (J. Shea Dep. 29:4–20; CSMF ¶ 50.) It is undisputed that the entire time during which Plaintiffs were prevented from residing in the apartment fell within the duration of their month-to-month lease. (CSMF ¶¶ 50, 52.)

---

[12] In *Valdes*, the court ultimately concluded that "no valid tenancy was ever created under New York state law" because the plaintiffs illegally occupied boarding houses created in violation of town zoning ordinances. *Valdez v. Town of Brookhaven*, No. 05-cv-4323, 2005 WL 3454708, at *10 (E.D.N.Y. Dec. 15, 2005).

*Schmitt* is also distinguishable as the plaintiffs there argued that a month-to-month lease gave them a right to "*purchase* their leasehold from the City" and challenged the City's decision "not to sell them their leasehold property" in addition to purportedly evicting them without notice or an opportunity to be heard. 999 F. Supp. at 361–62. The court found that the plaintiffs had "failed to prove that there was any *actual or constructive eviction* from any part of their leasehold," and the bulk of the court's procedural due process analysis focused on the plaintiffs' claimed entitlement to purchase the property from the City. *Id.* at 361–63, 366. In that context, the court found that the plaintiffs lacked a "legitimate claim of entitlement to *remain in possession*" of the property under *Roth* and that the plaintiff's "lease or tenancy does not have a 'property interest' protected by the Constitution." *Id.* at 361 (emphasis added). To the extent that these findings in *Schmitt* are not limited to the procedural due process claim against the City's decision not to sell the plaintiffs the property at issue, such a broad conclusion is contrary to the authority recited above.

For all of these reasons, Plaintiffs possessed a protected property interest in both accessing their personal property inside the apartment after condemnation of the property and continued residence in the basement apartment until at least November 30, 2018.

B.  Deprivation

It is "well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment." *Fuentes*, 407 U.S. at 84–85. Due process concerns can "be triggered by something less than 'a complete, physical, or permanent deprivation of real property.'" *Diaz v. Paterson*, 547 F.3d 88, 95 (2d Cir. 2008) (quoting *Connecticut v. Doehr*, 501 U.S. 1, 12 (1991)). Therefore, even "partial impairments to property rights . . . are sufficient to merit due process protection.'" *Id.* (quoting *Doehr*, 501 U.S. at 12).

Defendants do not dispute that Plaintiffs were deprived of their interest in residing in the basement apartment when Defendants condemned the property and directed Plaintiffs to immediately vacate the premises. However, Defendants contest that their conduct deprived Plaintiffs of access to their personal property for two reasons. First, they argue that there was no seizure under the Fourth Amendment, and therefore no deprivation of a protected property interest under the Fourteenth Amendment, because at most, Defendants "impeded the Plaintiffs' use of said property" and did not "remove[] [Plaintiffs'] personal property from the [p]remises." (Mot. at 14.)[13] Second, Defendants argue that Plaintiffs were able to re-enter the premises to retrieve property by contacting their landlord, as Frankie Shea did on three occasions and as Joseph Shea did around five to six times. (*Id.* (citing CSMF ¶¶ 46, 48).) Plaintiffs, in turn, dispute both the amount of time Defendants provided them to retrieve their property and that they were able to return with ease. *See infra* Discussion § III.B.i. Finally, in seeking qualified immunity, Defendants argue that Plaintiffs offer only "conclusory assertions" that Defendant Paccione engaged in the alleged violation of their constitutional rights. (Mot. at 17.)

First, I consider whether there is a material question of fact as to whether Plaintiffs suffered a deprivation of their property interests. Second, I determine whether there are material questions of fact as to whether Trejo and Paccione deprived Plaintiffs of their protected property interests.

With respect to Plaintiffs' property interest in residing in the apartment, the undisputed record shows that at least some Defendants infringed on this interest because the condemnation of the property on October 24, 2018 prevented Plaintiffs from residing in the apartment for at

---

[13] Defendants generally argue that there is "no practical distinction" between Plaintiffs' Fourth and Fourteenth Amendment claims. (*See* Mot. at 13.)

least ten days (CSMF ¶ 50), and Joseph Shea testified that Plaintiffs could not reenter their home for more than two weeks (J. Shea Dep. 29:4–20).

With respect to Plaintiffs' interest in accessing their personal property, Defendants' arguments are unavailing for two reasons. First, even if Defendants did not affect a "complete, physical . . . deprivation" or taking of Plaintiffs' property, Defendants' act of evicting Plaintiffs from their home resulted in a "partial impairment[]" to their use of personal property, which is sufficient to trigger procedural due process protections. *Diaz*, 547 F.3d at 95; *Fuentes*, 407 U.S. at 84–86 (even temporary deprivations of personal property implicate due process, although "the length and consequent severity of a deprivation may be [a] factor to weigh in determining the appropriate [process]" due); *see also Diaz*, 547 F.3d at 95. Therefore, any evidence that Plaintiffs were able to retrieve their property at some point is a factor considered in determining whether Plaintiffs received adequate process, not whether Defendants infringed on Plaintiffs' protected property interest in accessing their personal property in the first place. *See Tammaro v. City of New York*, No. 13-cv-6190, 2018 WL 1621535, at *6 (S.D.N.Y. Mar. 30, 2018) (considering a procedural due process challenge to the adequacy of property retrieval procedures for property seized from the plaintiff during an arrest).

Thus, the undisputed facts demonstrate that Plaintiffs experienced an infringement of their protected property interests in residing in the basement apartment for the duration of their month-to-month lease and in using and accessing their personal property located in the apartment after the property was condemned. I turn now to the question of whether there is a question of fact as to whether specific Defendants were personally involved in carrying out these deprivations.

It is undisputed that Trejo decided to condemn the property on October 24, 2018, based on the determination that an imminent danger necessitated the condemnation under NYSPMC, and that Frankie Shea testified that Trejo threatened to arrest her and call CPS if she did not leave the basement apartment on October 24, 2018. *See infra* Discussion §§ II.C.i, III.A.i. Thus, viewed in the light most favorable to Plaintiffs, the record shows that Trejo deprived Plaintiffs of their interests in residing in the basement apartment for the duration of the condemnation and in using and accessing their personal property during that same period of time.

Defendants argue that Plaintiffs have not identified any evidence raising a question of fact as to whether Paccione was involved in the impairment of their property interests because Frankie Shea admitted that she did not engage in any discussions with Paccione, Paccione did not make any threats towards her, and Paccione "was tasked with investigating complaints related to the Premises and solely issued Town Code violations to the *owner* of the property." (Mot. at 17 (emphasis added); *see also* F. Shea Dep. 45:22–46:3 (testifying that Frankie Shea did not have "any discussions" with Paccione, who "was just next to [Trejo] the whole time").) Plaintiffs fail to address this argument in their opposition brief or to otherwise identify any evidence in the record showing that Paccione directly participated in the decision to condemn the property. (*See* Opp'n at 3–7, 9–11.) At best, in support of their Section 1983 conspiracy claim, Plaintiffs argue in a conclusory fashion that "Trejo and Paccione agreed to remove the plaintiffs from their home," but they fail to cite any evidence that Trejo and Paccione entered into such an agreement. (Opp'n at 11.) As a result, Plaintiffs' procedural due process claims against Paccione are deemed abandoned. *Bryan*, 462 F. Supp. 3d at 270.

However, even if Plaintiffs did not abandon these claims, Paccione would be entitled to summary judgment because Plaintiffs have failed to point to any evidence in the record giving

32

rise to a material question of fact as to whether Paccione was personally involved in the decision to condemn the property. Although there is evidence in the record that Paccione issued BTC violations to Hansen, this fact, standing alone, does not create a material dispute of fact as to whether she participated in the determination that these violations required the issuance of an order that Plaintiffs immediately vacate the basement apartment, thereby depriving Plaintiffs of access to their home and personal property. Accordingly, summary judgment is granted to Paccione on the procedural due process claims against her.

### C.  Notice and Opportunity to be Heard

Once a plaintiff shows a deprivation of a protected property interest, "the question remains what process is due." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 319 (2d Cir. 2002) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)). The key inquiry is whether the government provided the plaintiff notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 52 (2d Cir. 2018) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). To make that determination, courts balance the factors laid out in *Mathews v. Eldridge*: (1) "the private interest that will be impacted by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute safeguards"; and (3) "the [g]overnment's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail." 424 U.S. at 335; *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 191 (2d Cir. 2020). Because this test "entails balancing multiple factors . . . . 'due process is flexible and calls for such procedural protections as the particular situation demands.'" *Liberian Cmty. Ass'n*, 970 F.3d at 191 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). Notice must be reasonably

33

calculated under all the circumstances to "afford [interested parties] an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Walter v. Queens Coll.*, 390 F. Supp. 3d 382, 399 (E.D.N.Y. 2019). And, "[d]ue process ordinarily requires an opportunity for some kind of a hearing *prior* to the deprivation of a significant property interest." *Chunn v. Amtrak*, 916 F.3d 204, 207 (2d Cir. 2019) (emphasis in original) (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299 (1981)).

Nonetheless, courts have recognized several exceptions to the general rule that pre-deprivation notice and opportunity to be heard is the norm. First, where a "deprivation at the hands of a government actor is 'random and unauthorized,' hence rendering it impossible for the government to provide a pre-deprivation hearing, due process requires only a *post*-deprivation proceeding." *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003) (emphasis added). Likewise, "in emergency situations," procedural due process may be satisfied by "some meaningful means by which to assess the propriety of the State's action at some time after the initial taking.'" *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 50 (2d Cir. 2009) (quoting *Parratt v.* Taylor, 451 U.S. 527, 539 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)). Consistent with these standards, the Second Circuit has held that, absent an emergency, municipalities must provide pre-deprivation notice and a hearing before declaring a residence unfit for human occupancy. *See Heckman v. Town of Hempstead*, 568 F. App'x 41, 44–46 (2d Cir. 2014) (summary order). Similarly, the government must provide pre-deprivation notice *and* a hearing *before* depriving a person of personal property except in "extraordinary situations" where seizure is "necessary to secure an important governmental or general public interest" and where there is a "special need for very prompt action." *Fuentes*, 407 U.S. at 90–91.

34

Here, with respect to Plaintiffs' remaining procedural due process claims against Trejo and the Town, Defendants contend that, based on the undisputed factual record, Plaintiffs were provided adequate notice and opportunity to be heard. They argue that the decision to condemn the property and prevent them from accessing their personal property was an emergency preventing pre-deprivation notice and opportunity to be heard and that Trejo's conduct was random and unauthorized, making a pre-deprivation hearing impossible. (Mot. at 4–12.) Plaintiffs oppose but only address the lack of a pre-deprivation hearing. (Opp'n at 6.) They do not challenge any lack of notice or identify any deficiencies in the post-deprivation process afforded to them, either with respect to the condemnation of their home or the procedures afforded to them for accessing their personal property following the condemnation.[14] Accordingly, the question that remains on the procedural due process claims is whether, construing the facts in the light most favorable to Plaintiffs, I can conclude as a matter of law either that Trejo's conduct was random and unauthorized or that the circumstances presented an

---

[14] In opposing summary judgment with respect to their Fourth Amendment claim, Plaintiffs dispute Defendants' contention that they "had multiple opportunities to retrieve their belongings." (Opp'n at 8.) There are even disputes of fact with respect to these post-deprivation procedures. (*See, e.g.*, Hansen Dep. 14:18–23 (testifying that Trejo would call the police when anyone tried to retrieve property from Plaintiffs' home).)

However, Plaintiffs do not raise these issues with respect to their Fourteenth Amendment claims in either their opposition brief or the Complaint, nor do they cite any legal standards governing what constitutes adequate post-deprivation procedures for retrieval of personal property from a condemned home. (Opp'n at 3–7; Compl. ¶ 56.) Moreover, even with respect to their Fourth Amendment claims, Plaintiffs do not offer any authority showing that the alleged inability to retrieve their belongings from the condemned property demonstrated any inadequate post-deprivation process. (*See* Opp'n at 8–9.) Plaintiffs have therefore abandoned any objection to the content of any post-deprivation notice that they received or to the adequacy of post-deprivation procedures by failing to raise such objections in their opposition to Defendants' Motion for Summary Judgment. *See Bryant*, 462 F. Supp. 3d at 270.

emergency such that the failure to provide a pre-deprivation hearing did not violate procedural due process.[15] The record gives rise to genuine disputes of material fact on both issues.

### i. *Did an Emergency Justify the Condemnation of Plaintiffs' Home Without Pre-Deprivation Process?*

I consider first Defendants' argument that due process required only a post-deprivation opportunity to be heard because Trejo deemed the condemnation "necessary on an emergency basis." (Mot. at 5.) "Where there is an emergency requiring quick action and where meaningful pre-deprivation process would be impractical," the government is not required to provide pre-deprivation notice and an opportunity to be heard "as long as there is an adequate procedure in place to assess the propriety of the deprivation afterwards." *WWBITV, Inc.*, 589 F.3d at 50 (citing *Parratt*, 451 U.S. at 539)). Under this standard, an official's reasonable belief that the public is in "immediate danger must be awarded significant deference." *Id.* at 50. After all, "[e]xacting hindsight analysis, where every mistake, even if made in good faith" exposes an official to liability would "discourage officials from taking prompt action to insure the public safety." *Id.* (quoting *Catanzaro*, 188 F.3d at 63). As a result, "where there is *competent evidence* allowing an official to *reasonably believe* that an emergency does in fact exist the discretionary invocation of an emergency procedure results in a constitutional violation only where such invocation is arbitrary or amounts to an abuse of discretion." *WWBITV, Inc.*, 589 F.3d at 51 (emphasis added).

Still, the government "may not avoid affording due process to citizens by arbitrarily invoking emergency procedures," and summary judgment "may not be awarded where there is a

---

[15] In seeking summary judgment on Plaintiffs' procedural due process claims based on the deprivation of access to their personal property, Defendants do not make any arguments separate from those made in moving for summary judgment on Plaintiffs' claims that they were denied procedural due process in the condemnation of their home. (*See* Mot. at 2–12.) Both sets of claims are therefore analyzed together.

genuine issue of fact as to whether officials acted arbitrarily in declaring an emergency." *Id.* at 51 (citing *Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999)). Thus, before declaring a structure "unfit for human occupation" on an emergency basis, municipal officials must "adduce evidence attesting to whatever *imminently dangerous* emergency conditions they believed justified boarding up [the plaintiff's] house without notice." *Heckman*, 568 F. App'x at 46 (emphasis added). For example, the Second Circuit has granted summary judgment on the basis that no dispute of fact existed on the issue of reasonable danger where a car crashed into the supporting beam of a building, causing the building to buckle, *Catanzaro*, 188 F.3d at 58–59, and where a fire caused "extensive[] damage[]" to a hotel, *WWBITV*, 589 F.3d at 48.

By contrast, however, courts have denied summary judgment on the question of whether officials enforcing town housing and nuisance codes "abuse[d] [their] discretion in invoking an emergency" where the officials knew about supposedly dangerous conditions on a property but delayed taking action because such delay raised material questions of fact about whether an imminent danger actually existed. *Ferreira v. Town of E. Hampton*, 56 F. Supp. 3d 211, 228 (E.D.N.Y. 2014); *see also WWBITV, Inc.*, 589 F.3d at 51 (reaffirming the Second Circuit's holding in *Burtnieks v. City of New York*, 716 F.2d 982 (2d Cir. 1983), that the "existence of a three-month delay between when the city declared an emergency and when it demolished [a] building gave rise to a genuine issue as to whether the defendants acted arbitrarily" in condemning the structure without a pre-deprivation opportunity to be heard); *Heckman*, 568 F. App'x at 46 (holding that a complaint plausibly alleged that government officials did not "reasonably believe" that an emergency existed where it alleged that municipal officials conceded in writing that they could have sent a letter setting a deadline for compliance). Likewise, where "[t]he record does not clearly . . . reveal the severity of the risks posed by

[alleged] violations," it lacks "facts from which a reasonable building inspector could conclude that occupants might be imminently endangered." *Gardner v. Evans*, 920 F.3d 1038, 1057 (6th Cir. 2019).

Applying these standards here, Defendants argue that the various citations issued by Paccione and Trejo show a reasonable belief that the conditions of the basement apartment posed an imminent danger. These code violations fall into two categories.

First, there is Trejo's allegation that she found "[m]old on [an] exterior wall" of a first-floor-unit bedroom and "[s]ignificant mold" in a first-floor-unit bathroom. (Trejo Interrogatories, No. 7.) Paccione also documented this supposed mold but described it in state court filing as a "massive amount of mildew" in the master bedroom of the first-floor apartment in violation of BTC § 82-3. (BTC Violations at 5; *see also* CSMF ¶ 37(e).)

Second, Defendants identify issues related to fire safety and other unsatisfactory conditions in Plaintiffs' home, and these issues are the focus of their Motion. Paccione issued violations in state court alleging two issues:

(1) an absence of "required operational smoke detectors and alarm devices" in the basement in violation of BTC § 82-6 (BTC Violations at 4; *see also* CSMF ¶ 37(d)); and

(2) an "interior door from the basement to the main dwelling [being] blocked with no means of egress" in violation of BTC § 82-3 (BTC Violations at 6; *see also* CSMF ¶ 37(f)).[16]

---

[16] Defendants' reply brief also cites this same code violation as finding "multiple outlets with exposed wiring." (Reply at 3.) However, that code violation indicates that this issue was "observed . . . on the 1st floor," and Defendants fail to explain how conditions in the first-floor apartment created an imminent danger requiring emergency condemnation of the basement unit. (BTC Violations at 6.)

(*See* CSMF ¶ 37.)[17] Upon "inspecting" the basement apartment, Trejo "made note" of similar violations in her responses to interrogatories, which she described as: (1) an absence of smoke and carbon monoxide alarms in the basement; (2) no egress from two bedrooms; and (3) no windows in one of these bedrooms, which was occupied by children. (Mot. at 7–8; *see* Trejo Interrogatories No. 7; CSMF ¶¶ 38–39.) Trejo also alleges that she "made note" of several other hazards that do not appear in any of the violations filed by Paccione in state court. Those relate to: (1) a lack of ventilation in one of the bedrooms and boiler room, (2) broken pipes and an oil leak in the boiler room, (3) an electric panel lacking requisite clearance and showing signs of tampering, and (4) restricted access to the boiler room as a result of its use for storage. (Trejo Interrogatories No. 7.)[18] Nonetheless, when Plaintiffs' counsel presented Trejo with her interrogatories during deposition, Trejo testified that in "one way or another" every one of the safety violations she identified "present[ed] an imminent danger to the occupants" of Plaintiffs' home because each is a "major issue[]" prohibited by the NYSPMC. (Trejo Dep. 11:4–12:10.)[19]

---

[17] Paccione issued three additional code violations concerning the basement apartment, but all three relate to registration and permitting. (BTC Violations at 1–3; *see also* CSMF ¶ 37(a)–(c).) As a result, none of these violations give rise to any "immediate danger," and Defendants do not cite these violations as evidence of any such danger. (*See* Mot. at 6–8; Reply at 2–3.)

[18] Defendants also cite twenty-one safety violations issued by Trejo concerning the first-floor unit. (*See* Defs.' MSJ Mem. at 6.) However, they fail to meet their burden on summary judgment of explaining how any of those specific violations created a reasonable belief of an imminent danger in the *basement unit* where Plaintiffs lived.

[19] "[A]nswers to interrogatories may be considered [on summary judgment] so far as they are admissible under the rules of evidence, where such answers are not based upon personal knowledge." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 n.1 (2d Cir. 1968). However, such answers may not be considered when they are not verified. *Id.* at 273. Here, Trejo's interrogatories are not verified or sworn under penalty of perjury so they would not ordinarily be considered on summary judgment. (*See* Trejo Interrogatories No. 7.) Nonetheless, because Trejo testified in deposition that the grounds set forth in her responses to interrogatories

Plaintiffs make two arguments in response. First, they argue that none of the violations show that either Trejo or Paccione "believe[d] there to be an imminent danger" because the violations are not "the type contemplated by" BTC Section 73-14, which Plaintiffs contend provides the "authority and procedures to order Town of Brookhaven residents to vacate their home due to imminent danger." (CSMF ¶ 63; *see* Opp'n at 6). Second, they argue that there is a dispute of fact as to the existence of the alleged violations and whether such violations can support a reasonable belief of imminent danger. (Opp'n at 7.) Plaintiffs are correct in part.

Starting with Plaintiffs' first argument, I find that BTC Section 73-14 alone does not control the imminent danger analysis as Plaintiffs assert; rather, BTC Section 73-14 and NYSPMC Sections 107.1 and 108.1 set forth relevant considerations. *See Heckman*, 568 Fed. App'x at 46 (citing town building codes as evidence in determining the "imminently dangerous emergency conditions" that might justify boarding up a person's home "without notice"). As previously explained, Section 107.1 provides for the "authority having jurisdiction" to "exercise its powers *in due and proper manner*" to protect the public where a premises "constitutes a clear and imminent threat to human life, safety or health." NYSPMC § 107.1. Plaintiffs do not provide any authority for the proposition that condemning a property without a pre-deprivation hearing violates Section 107.1, and to the contrary, Section 103.2.1 appears to authorize such condemnations. *See* NYSPMC § 103.2.1 (providing that in "cases of imminent danger" removing occupants "without first providing an opportunity to be heard shall be permitted to the extent consistent with applicable Constitutional provisions").

---

were all bases for condemning the basement apartment, she adopted them during deposition. (Trejo Dep. 11:4–12:10.)

Nonetheless, Defendants have not shown that they are entitled to judgment as a matter of law on the question of whether an emergency justified the condemnation of Plaintiffs' home without pre-deprivation process because there are significant material disputes of fact as to the timing and basis for the condemnation and the existence and severity of the hazards alleged by Trejo and Paccione.

### 1. Timeline of the Condemnation

First, there are material disputes of fact concerning *when* Trejo decided to condemn the building, and therefore what she knew at the time she ordered Frankie Shea to vacate the house. When asked at deposition to "walk [counsel] through anything that happened" "from when [Trejo] and [Paccione] arrived" at the Shea's home on October 24, 2018, Frankie Shea testified that Trejo knocked on the door, gave Frankie Shea her card, and said "there was mold in the house," so the Sheas "would have to leave" and they "might not be able to get back in because of the mold." (F. Shea Dep. 42:11–22.) Frankie Shea's testimony is unclear as to the exact sequence of events that followed. Initially, she testified that she began "gathering . . . everything [she] would need to leave" and, within five minutes of Trejo's arrival, she called Joseph Shea to tell him what was going on. (*Id.* 42:23–43:7.) She also testified that when Trejo told her the house was uninhabitable due to mold, Trejo also said that Frankie Shea had "an hour to gather things together to leave" and that if she did not leave, "[Trejo] would get [Frankie Shea] arrested," and "[t]hat's when [Trejo] called the officers and they came in." (*Id.* 43:8–17, 44:5–11.)[20] However, later when asked "[a]t what point did the police come in," Frankie Shea testified:

> [The police] came pretty quickly. I was only talking to [Trejo] for, like, a few minutes. She kept coming downstairs. Going back upstairs and then coming back. And that's when

---

[20] Frankie Shea testified that she did not have any discussions with Paccione; Paccione was "just next to [Trejo] the whole time." (F. Shea Dep. 45:22–46:3.)

> she had the two officers there, I guess because I was questioning it. So she felt that she needed to get the cops to help her or something . . . . I didn't argue with her . . . . But I did call my husband and tell him what happened.

(*Id.* 44:14–25.) Frankie Shea testified that Joseph Shea came "[p]robably 20 minutes later" and they vacated within the hour, "but there were definitely holes in the hour." (*Id.* 48:10–16.) She did not explain what she meant by this.

Given Frankie Shea's testimony that Trejo kept going upstairs and then coming back downstairs, the precise sequence of events is not entirely clear. Nonetheless, construing her testimony and the record in the light most favorable to Plaintiffs, a reasonable jury could conclude that, regardless of when police actually arrived, Trejo had condemned the property by the time she informed Frankie Shea that she had an hour to vacate the property and "might not be able to get back in" while still at the threshold of entry and before inspecting the premises.

Joseph Shea's testimony is largely consistent with this account except with respect to the amount of time he had to remain in the house. He testified that, on October 24, 2018, he received a call from Frankie Shea and then came home from where he was working about fifteen minutes away. (J. Shea 13:7–21.) When he arrived, Trejo, Paccione, and two police lieutenants were already present, and Trejo told Joseph Shea that the Sheas had to "vacate the premises" because "the house was getting condemned" due to mold. (*Id.* 13:19–14:9.) Joseph Shea testified that he "argued the facts that it was not mold" and went with Trejo to view the purported mold in the upstairs unit, but that Trejo threated to have him and Frankie Shea jailed and their children taken by CPS if they did not vacate the apartment. (*Id.* 13:21–14:9.) He testified that, as a result, the family "got some things together and left." (*Id.* 14:7–9.) Joseph Shea also testified that although he requested it, Trejo denied him the ability to "lock up and put [his] stuff that was outside away." (*Id.* 17:17–23.) However, later in his deposition, Joseph Shea testified that Frankie Shea

42

left the house *before* he did and that after she left, he stayed in the apartment for "probably

around five or six hours" with Trejo and Paccione. (*Id.* 22:8–21.) Joseph Shea testified that he

ultimately left the house before Trejo and Paccione. (*Id.* 23:3–4.)

Trejo and Paccione dispute these accounts. Paccione testified that the reason for the

October 24, 2018 inspection was to determine if the Sheas were home because they had been

absent when Paccione inspected the upstairs apartment on September 12, 2018. (Paccione Dep.

8:6–9:11.) She testified that she arrived alone and that, upon her arrival, she spoke first with the

upstairs tenants and then with Frankie Shea, but that she could not recall if she entered the

basement apartment while waiting for Trejo. (*Id.* 10:7–23.) Paccione testified that once Trejo

arrived, she and Trejo inspected the first-floor apartment and then asked Frankie Shea if they

could inspect the basement apartment. (*Id.* 11:17–13:13, 15:4–15.) Paccione testified that she and

Trejo inspected every room of the basement apartment, but she could not recall whether she

"indicate[d] anything to [Frankie Shea] with respect to what [her] findings were" or whether she

suggested that Frankie Shea leave the apartment. (*Id.*) Paccione denied making any

recommendations to Frankie Shea at the conclusion of the inspection, ordering Frankie Shea to

leave, or threatening the Sheas in any way. (*Id.*) She could not recall if she called the police. (*Id.*

15:23–25.)

Trejo testified to the "condemnation process" she follows generally but not to the precise

sequence of events that transpired on October 24, 2018. (*See* Trejo Dep. 13:2–21.) Her process is

to first inspect the outside of a house, then to inspect the inside, and upon identifying safety

issues, to "speak to the occupants of the dwelling, explain to them what the violations are," and

"give them options of where to find different housing, if they choose to. If they choose not to,

they stay in the house." (*Id.*) Trejo testified that, on October 24, 2018, she "recommended to [the

43

Sheas] that they should leave the property . . . right [then] because [it was] not safe for them and their children," but she denied ordering them to leave or calling the police. (*Id.* 14–23, 15:2–8.) She also did not testify as to *when* she made this purported recommendation or whether she had inspected the basement apartment or identified any potential hazards aside from mold in the first-floor unit at the time she made this recommendation. Trejo testified that after "everyone had left," she secured the building by placing padlocks on the doors, and that she did this at the direction of then-Senior Building Inspector Robert Incagliato because the Sheas and the upstairs tenants were each "concerned about the other person breaking into their part of the house." (*Id.* 39:14–41:9.)

Accordingly, no witness has unambiguously testified as to whether Trejo had inspected the basement apartment when she either recommended or ordered Frankie Shea to vacate her home. Paccione denies ever recommending or ordering Plaintiffs to vacate their home, and Trejo did not testify as to the precise sequence of events. However, as noted, viewing the record in the light most favorable to Plaintiffs as the non-moving party, a reasonable jury could infer from Frankie Shea's testimony that Trejo ordered Frankie Shea to vacate the home when she knocked on the door and gave Frankie Shea her card, which was *before* Trejo inspected the basement apartment. Accordingly, there are disputes of fact as to: (1) when the condemnation occurred between Trejo's initial arrival on the premises and the moment she padlocked the doors; and therefore (2) what Trejo *knew* at the time she condemned the property and ordered Plaintiffs to vacate. Construing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that the only alleged safety hazard Trejo was aware of when she condemned the home was the purported mold in the first-floor unit.

44

## 2. Basis for the Condemnation

Second, there are material disputes of fact as to the basis for Trejo's decision to condemn Plaintiffs' home. Although Defendants' briefing focuses on the alleged "unsafe equipment" and lack of egress and fire alarms in the basement unit, multiple witnesses testified that the purported mold on the first floor was the real reason that Trejo condemned the home—not the myriad code violations Defendants now assert. (*See* F. Shea Dep. 43:5–17 (testifying that the mold in the upstairs unit was the *only reason* she was given that she was being evicted); J. Shea Dep. 14:23–15:16 (testifying that all the alleged mold was in the upstairs unit); Hansen Dep. 10:16–19 (admitting that he replaced the smoke detectors but that the "main thing, which caused this whole thing was an accusation of mold").) In fact, even Trejo's testimony is unclear on this issue. Paccione testified that she believed that conditions in the apartment presented a danger to the occupants because the bedroom belonging to one of the children lacked a window that would permit escape in the event of an emergency, but Trejo did not address this issue. (Paccione Dep. 17:16–25; Trejo Dep. 11:8–7.) She testified that all of the hazards listed in her response to interrogatories are grounds that can "present an imminent danger," however the only conditions she specifically addressed in the deposition transcript excerpts submitted by the parties are the various asserted hazards in the basement boiler room. (Trejo Dep. 11:8–7.)

The disputes concerning these material facts compound the disputes regarding what Trejo knew at the time she condemned the property. A reasonable jury could credit Plaintiffs' testimony that purported mold in the first floor unit was the only basis asserted for the condemnation at the time the Sheas were ordered to leave their home, which would support an inference that Trejo had not observed any of the other alleged hazards in the basement unit when

45

she condemned the property. I therefore consider the disputes of fact regarding the existence and severity of each alleged violation.

### 3. Existence and Severity of Safety Hazards

#### a. Mold

I start with the purported mold since it is the only hazard of which Trejo was undisputedly aware at the time she condemned the property. There can be little doubt that in some circumstances, mold can be sufficiently serious to support a reasonable belief of imminent danger. *See, e.g.*, *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 415, 419 (3d Cir. 2008) (holding that defendants' condemnation of an apartment building without a pre-deprivation hearing did not offend due process where it was undisputed that vacant "basement apartments were overrun with mold" and state experts advised there to be a "serious health threat" posed by the "likelihood that mold spores were migrating up to the occupied units through" pipes and ventilation ducts). However, here, Jospeh Shea testified that it was plainly observable that the purported mold was only rotten plywood. (J. Shea Dep. 15:2–16.) Moreover, in contrast with Trejo, Paccione described the purported mold as "mildew." (BTC Violations at 5.) After-the-fact testing also showed that there was "no mold." (Hansen Dep. 10:21–25; CSMF ¶ 38.)

Courts should not apply "[e]xacting hindsight analysis, where every mistake" exposes an official to liability. *WBITV, Inc.*, 589 F.3d at 51. Nevertheless, Defendants do not point to any testimony from Trejo "articulat[ing] standards" by which she judged that the purported mold in the upstairs unit appeared "sufficiently severe to justify . . . immediate eviction" of the basement residence. *Gardner*, 920 F.3d at 1058. Instead, the Individual Defendants waited more than one month between Paccione's first inspection of the upstairs apartment and return inspection on

46

October 24, 2018, when Trejo condemned the property and ordered Plaintiffs to vacate. ECF No. 40-6; F. Shea Dep. 43:18–44:11; s*ee Ferreira*, 56 F. Supp. 3d at 228 (holding that a "significant delay between recognition of a supposed emergency and the act to remedy that condition could . . . support a reasonable finding that the Town officials acted arbitrarily in declaring . . . an immediate danger to the public.").

Trejo's testimony that she merely "recommended" that Plaintiffs leave the property and gave them the choice to remain in the residence is also significant. (Trejo Dep. 14:23–15:5.) Construing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Trejo's testimony that she believed there was an imminent danger is not credible in light of her own testimony that she gave Plaintiffs the *option* of remaining in their home.

For all of these reasons there are several "genuine issue[s] of fact as to whether [Trejo] acted arbitrarily in declaring an emergency" on the basis of mold in the upstairs apartment. *WWBITV, Inc.*, 589 F.3d at 51.

### b.   Remaining Violations

As noted, Defendants' briefing focuses on the alleged violations other than mold in the first-floor unit as the basis for condemning the property. (*See* Mot. at 5–9.) One of these violations is undisputed—the lack of egress from the basement apartment due to a blocked door between the first floor and basement apartments—but there are significant disputes of fact with respect to the existence of the remaining violations.

I start with the lack of adequate egress. It is undisputed that because the door connecting the first-floor apartment with the basement apartment remained locked from the first floor, Plaintiffs' home lacked adequate means of egress. (CSMF ¶ 16.) Defendants argue that this violation posed an imminent danger because "[i]n the event of an emergency, such as a fire, the

47

absence of clear escape routes . . . could impede [Plaintiffs'] ability to evacuate swiftly and safely." (Mot. at 7.) It is also undisputed that: (1) Dorothea Maute sent an email to the Town requesting an inspection of a "downstairs apartment" because her daughter was "afraid of a fire" (ECF No. 40-6.); and (2) Joseph Shea left cigarette butts "on the ledge" inside the apartment (F. Shea Dep. 38:2–6). NYSPMC Sections 107.1 and 108.1 and BTC Section 73-14 do not expressly identify a lack of adequate egress as an issue rising to the level of imminent danger. However, Section 107.1.1 defines an unsafe structure as one that does not provide "minimum safeguards to protect . . . in the event of fire." NYSPMC §§ 107.1.1, 108.1; *see also Heckman*, 568 Fed. App'x at 46 (citing town building codes in assessing imminent danger). However, Defendants fail to point to any evidence, much less undisputed evidence, showing that Trejo was aware of these facts at the moment she condemned the property and barred Plaintiffs from returning to access their personal property. Accordingly, I cannot conclude that Trejo had a "reasonabl[e] belie[f] that an emergency [did] in fact exist," *WWBITV, Inc.*, 589 F.3d at 51, based on the lack of egress from the basement apartment.[21]

Construing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Trejo acted arbitrarily in "invoking" a lack of adequate egress as a basis for immediately condemning the property for two reasons. *Id.* at 51. First, because there is a dispute of fact as to when Trejo condemned the property and ordered Plaintiffs to vacate, it is disputed

---

[21] Moreover, I do not decide whether inadequate egress standing alone constitutes "competent evidence" of imminent danger, *WWBITV, Inc.*, 589 F.3d at 51, and the parties have not briefed this question. Inadequate egress may be a dangerous condition preventing an occupant from escaping in the event of fire or other emergency, but absent more than a speculative risk that an emergency could occur, that does not necessarily make it an "*imminently* dangerous emergency condition[]" that justifies immediate dispossession of one's home without any advance notice. *Heckman*, 568 F. App'x at 46 (emphasis added).

whether Trejo was even aware of the lack of egress when she condemned the property—and therefore, whether it could serve as a basis for condemning the basement apartment without a pre-deprivation hearing.[22] Second, there is a dispute of fact as to whether Trejo subjectively believed an imminent danger existed as demonstrated by: (1) the testimony that Trejo did not raise the risk of fire as the basis for condemning the property at the time she ordered Plaintiffs to vacate their home; (2) Trejo's own testimony that she merely "recommended" that Plaintiffs leave their home; and (3) evidence that Defendants waited one month between Paccione's first inspection of the property in September 2018 and Trejo's October 24, 2018 decision to summarily condemn the basement apartment and order Plaintiffs to vacate within the hour. *See supra* Discussion § II.C.i.2, 3.a. In light of all this evidence, a reasonable jury could conclude that Trejo arbitrarily condemned the property because she did not in fact believe that the lack of egress posed an imminent danger at the time she made the decision and only raised it as an after-the-fact justification for a condemnation premised on alleged mold in the upstairs apartment.

The remaining code violations raised by Defendants are even less persuasive. At the outset, each of the reasons giving rise to a dispute of fact as to whether Trejo arbitrarily invoked the lack of egress as a basis for condemning the property apply equally to the remaining violations. However, there are also significant disputes of material fact with respect to the existence of each violation.

---

[22] The September 4, 2018 email from Dorothea Maute that prompted Paccione to inspect the first-floor apartment on September 12, 2018, alleged that children resided in the "downstairs apartment" in a room without windows. (ECF No. 40-6.) However, Defendants have not argued that Trejo was aware of this letter; nor have they identified any evidence in the record that would establish this fact.

First, Trejo testified in deposition that a lack of smoke and carbon monoxide alarms in the basement unit supported her decision to condemn the property, but there are disputes of fact as to whether Trejo actually relied on any of these asserted violations in making the condemnation decision. Frankie Shea testified in deposition that the basement contained four smoke alarms—one in each bedroom, one in the hallway, and one in the kitchen—and two carbon monoxide alarms. (F. Shea Dep. 32:23–33:18.)[23]

Second, in response to interrogatories, Trejo asserts that various hazards concerning the boiler room, bedroom ventilation, and an electrical panel supported her decision to condemn the property, but none are addressed in any of the violations issued by Paccione. *Compare* Trejo Interrogatories No. 7 (listing these "violations"), *with* BTC Violations (not raising them). Accordingly, there is a dispute of fact as to whether Trejo actually relied on these hazards to form a reasonable belief that the property posed an imminent danger, or whether she arbitrarily invoked these issues to justify the condemnation after the fact. *See Perkowski v. Town of Brookhaven*, No. 18-cv-5480, 2021 WL 4408047, *6, 9 (E.D.N.Y. Sept. 27, 2021) (holding that a genuine dispute of fact existed regarding whether the there was an emergency justifying condemnation of a property because, among other reasons, the defendant could not recall if he "issued any warnings for purported violations").

---

[23] Defendants argue that the alleged absence of operational smoke and carbon monoxide alarms supported a reasonable belief of imminent danger because Section 107.1.1. defines "unsafe structures" to includes structures "dangerous to the life, health, property or safety of the public . . . by not providing minimum safeguards to protect or *warn occupants* in the event of fire." (Mot. at 5 (quoting NYSPMC § 107.1.1).) However, because there is a dispute of fact as to whether the basement apartment lacked smoke and carbon monoxide alarms, I need not decide whether, as a matter of law, the absence of operational smoke alarms can, without accompanying conditions suggesting a risk of fire, support a reasonable belief of imminent danger. *Cf. Gardner*, 920 F.3d at 1057 (holding that a smoke detector not being installed high enough did not create a reasonable belief of imminent danger).

Third, there is a dispute of fact as to whether the alleged hazards concerning the boiler room actually existed, as Plaintiffs contend that Trejo and/or Paccione returned to the property after it was condemned in "an attempt to make the property uninhabitable." (Opp'n at 7.) Frankie Shea testified that she believed that Trejo and Paccione opened the boiler drain after the property was condemned and that it caused flood damage to the property, although she admitted that she did not "personally know that the flooding was caused by the boiler." (F. Shea Dep. 101:09–104:19.) Grella testified that she saw someone using a garden hose to fill the oil tank on the property with water. (Grella Dep. 11:15–16:19.) And Trejo admitted during her deposition that she re-entered Plaintiffs' home after it had been condemned and that a video records her "going in" the Sheas' refrigerator. (Trejo Dep. 43:6–48:13; *see also* CSMF Resp. ¶ 72 (not disputing that Treo and Paccione "entered the Premises during the condemnation").) Although Trejo's belief that an imminent danger existed "must be awarded significant deference," here the record gives rise to a genuine dispute of material fact regarding whether Trejo fabricated her allegation that damage to the boiler created an emergency. *WWBITV, Inc.*, 589 F.3d at 51.

Moreover, even if there was some damage to equipment within the basement at the time that Trejo condemned the property, construing the facts in the light most favorable to Plaintiffs, there remains a dispute of fact regarding whether Trejo arbitrarily invoked emergency procedures. Although Trejo claims that the damage in the boiler room and to electrical wiring created an imminent danger, the evidence on which Defendants rely fails to establish the severity of these issues. For example, Trejo describes the conditions in the boiler room as follows:

> Q: Were there toxic fumes [in the basement]?
> A: There was oil leaking in the basement, which I believe is on here.
> Q: Where was the oil leak from?
> A: Boiler room not properly ventilated, no fresh air intake of the boiler room, boiler leaking oil creating hazard, hot water pipe was broken in the boiler room creating a hazard.

(Trejo Dep. 11:19–12:2.) Trejo's sparse testimony does not explain how leaking oil, a broken pipe, or any ventilation issues created an imminent "hazard to life, health, property or safety of the public or occupants." NYSPMC § 107.1.2. For example, Trejo does not address where or how oil was leaking, the volume of the leak, or the impact of the leak, which pipe was broken or what impact it was having, how ventilation was impeded, or the degree to which ventilation was limited. *See Gardner*, 920 F.3d at 1057–58 (holding that the imminent danger had not been established where many of the violations were "too vague to allow one to decipher their severity," and the defendant "who performed the inspection provided little additional clarity during his deposition"). Likewise, the only evidence in the record regarding any electrical issues in the basement apartment is a statement in Trejo's Complaint Report and response to interrogatories that the "electric panel appeared to be tampered with." (Trejo Interrogatories No. 7; Trejo Complaint at 2). Such general and conclusory allegations of disrepair do not meet Defendants' summary judgment burden to show that, based on the record viewed in the light most favorable to Plaintiffs, the officials who condemned the property reasonably believed that it presented an imminent danger. *See Lowery v. City of Albuquerque*, No. 09-cv-0457, 2011 WL 1336670, at *26 (D.N.M. Mar. 31, 2011) (holding that affidavits attesting to "general disrepair" to electrical wiring and plumbing were too conclusory to show an "immediate threat to life safety of the occupants" for purpose of a Fourth Amendment seizure claim).[24]

---

[24] As Plaintiffs argue, all these factual disputes demonstrate Defendants' misplaced reliance on *Weinberger v. Town of Fallsburg*, No. 18-cv-988, 2019 WL 481733 (S.D.N.Y. Feb. 6, 2019), *aff'd*, 801 F. App'x 37 (2d Cir. 2020); *see also* Mot. at 8; Opp'n at 6. Although there, the court held that defective smoke detectors, lack of egress, and exposed wiring, in conjunction with other code violations, warranted immediate condemnation of a property, the court emphasized that the plaintiff "[did] not dispute that most, if not all, of [the] deficiencies existed at the time of

\* \* \*

Accordingly, a genuine dispute of material fact exists regarding each of the purported bases for condemning Plaintiffs' home, and therefore whether Trejo "abuse[d] [her] discretion in evoking an emergency." *WWBITV, Inc.*, 589 F.3d at 51.

### ii.   Was Trejo's Conduct Random and Unauthorized?

Defendants argue that Trejo's conduct was "random and unauthorized" because the Complaint alleges that: (1) the Individual Defendants "'falsely' claimed the Premises was unfit for occupancy, improperly providing them with only one hour to vacate under threat of arrest"; (2) the Individual Defendants' conduct constituted "a vicious act of mental cruelty" that was an "abuse of power"; (3) the Individual Defendants engaged in a "coordinated" effort to carry out a pattern of "illegal evictions"; and (4) the Individual Defendants returned to the property to vandalize it. (Mot. at 10–11 (citing Compl. ¶¶ 1, 11–13, 28, 36, 43, 59–63).) In opposition, Plaintiffs argue, in conclusory fashion, that the "idea that the defendants' actions in this matter are random and unauthorized is not factually accurate and that argument is equally unpersuasive." (Opp'n at 7.) Defendants are correct that Plaintiffs "cannot solely rely on conclusory statements when opposing a summary judgment motion." (Reply at 4.) However, Defendants argument that Trejo's actions were "random and unauthorized" directly contradicts the position taken throughout the reminder of their Motion. (*See, e.g.*, Mot. at 5 ("[T]he condemnation was deemed necessary on an emergency basis and conformed to both State and local laws").)

---

[the defendants'] inspection." *Weinberger*, 2019 WL 481733, at *7. Therefore, Plaintiffs are right to distinguish *Weinberger* on the ground that they *are* disputing the alleged condition of the property at the time of inspection. (*See* Opp'n at 6.)

The "distinction between random and unauthorized conduct and established state procedures" is "not clear-cut." *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006). For example, even if a government actor's conduct "was not sanctioned by state law," such conduct is not random and unauthorized if a state or municipality "delegated to those actors '*the power and authority* to effect the very deprivation complained of . . . [and] the concomitant duty to initiate the procedural safeguards set up by state law," and the exercise of such authority led to the challenged deprivation. *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 138 (1990)) (emphasis added); *see also DiBlasio v. Novello*, 344 F.3d 292, 303 (2d Cir. 2003) (holding that where an official has the authority to summarily act and the duty to ensure procedures are followed, the abuse of an official's authority is not "random and unauthorized" conduct). Moreover, "post-deprivation remedies do not suffice where the 'government actor in question is a high ranking official with final authority over significant matters'" since the decisions of such officials "more closely resemble established state [and municipal] procedures than the haphazard acts of individual state [and municipal] actors." *Velez v. Levy*, 401 F.3d 75, 92 (2d Cir. 2005).

Applying these standards, the Second Circuit held in *Novello* that the suspension of a plaintiff's medical license by the New York Health Commissioner was not "random and unauthorized" because the Commissioner had "authority to summarily suspend [the plaintiff's] license" and the duty to ensure that the Health Department "followed the prescribed procedures governing summary suspensions." *Novello*, 344 F.3d at 303. Although the defendants had argued that the Commissioner had exceeded her authority by making "false and malicious statements" in a press release, the Second Circuit reasoned that the conduct was not unauthorized simply because the state official was alleged to have abused her delegated authority in order to "effect

54

the very deprivation complained of." *Id.* at 304; *see also Zinermon*, 494 U.S. at 114 (concluding that the conduct of eleven physicians, administrators, and staff members of a state hospital was not "unauthorized" because they had "broad power" to deprive persons of their liberty by admitting them into the state hospital).

Here, Plaintiffs do not allege that Trejo (or Paccione) are final policymakers. (*See* Opp'n at 11 (implying that both are "municipal employee[s] below the policymaking level")).) Nonetheless, construing the facts in the light most favorable to Plaintiffs, Trejo had the "power and authority to effect" the condemnation of the residence and the duty to carry out procedural safeguards set up by the NYSPMC and the BTC. *Rivera-Powell*, 470 F.3d at 465. BTC Section 73-14 directs that "occupants shall vacate [a] premises" where there is an enumerated "actual or potential danger to the building occupants or those in the proximity." Trejo testified that she condemned Plaintiffs' home pursuant to the established state procedures in NYSPMC § 107.1, and Defendants themselves argue the same. (Trejo Dep. 19:5–20:2, 20:19–22, 55:25; Mot. at 5.) The NYSPMC does not clearly identify *who* has authority to "exercise [the] powers" it provides to condemn a structure without a pre-deprivation opportunity to be heard, and Defendants do not argue or point to evidence showing that Trejo *lacked* the authority to condemn the property, remove Plaintiffs from the home, and restrict Plaintiffs' access to their personal property with the threat of arrest. NYSPMC § 107.1.[25] Absent such evidence, a reasonable jury could conclude

---

[25] BTC Section 73-15 authorizes the Chief Building Inspector or Town Attorney, on advice of the Engineer, to take "such immediate action as is necessary to protect life," including "boarding and securing [a property], without notice or hearing to the property owner." BTC § 73-15. However, Section 73-15 does not clearly preclude Trejo from condemning a structure. Plaintiffs in their 56.1 Statement also point to testimony from Incagliato that he was not Trejo's supervisor, that the Deputy Town Attorney had told him "not to bother her," and that he ignored complaints that he received about her. (CSMF ¶ 27; Incagliato Dep. 28:18–31:9.) Moreover,

that Trejo was carrying out "established state procedures," *Rivera-Powell*, 470 F.3d at 465, since municipal records show that Paccione issued the code violations and Paccione and Trejo both submitted Complaint Reports supporting Trejo's condemnation of the property. *See* BTC Violations; Paccione Complaint; Trejo Complaint; *see also Perkowski*, 2021 WL 4408047, at *8 (concluding that a deprivation was pursuant to an established state procedure where defendants removed litter from Plaintiffs' property pursuant to the BTC).

Defendants' arguments to the contrary are unpersuasive. Their argument that the challenged conduct was "unauthorized" because the Complaint alleges that Paccione and Trejo made the "false[]" determination that the premises was unsafe and "abuse[d] [their] power" by evicting Plaintiffs is the same argument that the Second Circuit rejected in *Novello*. *See* Mot. at 11; *Novello*, 344 F.3d at 303 (rejecting contention that the Commissioner exceeded her authority by making "false and malicious" statements and "abus[ing] [the] authority" delegated to her). Defendants rely on distinguishable cases involving condemnations and evictions where the alleged conduct was found to be "random and unauthorized" because, unlike here, the defendants either lacked legal authority to independently condemn a property or flagrantly violated town codes. *See Grune v. Hernandez*, No. 1:22-CV-857, 2023 WL 6065944, at *6 (N.D.N.Y. Sept. 18, 2023) (holding that the defendants issued an emergency notice to vacate a property without seeking the required authorization from the Town Supervisor); *Hong Tang v. Grossman*, No. 19-cv-6099, 2021 WL 1091908, at *6 (E.D.N.Y. Mar. 22, 2021) (holding that defendants evicted

_____

Trejo testified that she padlocked the basement apartment at Incagliato's direction. (Shea Dep. 39:14–41:9.) As a result, at a minimum, there is evidence that Incagliato "delegated [to Trejo] '*the power and authority* to effect the very deprivation complained," and even if he had not, Trejo's testimony creates a dispute of fact as to whether her actions were authorized by Incagliato. *Rivera-Powell*, 470 F.3d at 465 (emphasis added).

56

plaintiff "pursuant to state court proceedings," which permitted the court to vacate the warrant of eviction); *Ahmed v. Town of Oyster Bay*, 7 F. Supp. 3d 245, 255 (E.D.N.Y. 2014) (holding that plaintiffs alleged that defendants disregarded procedures in the town code). Finally, Plaintiffs' allegations that Defendants vandalized Plaintiffs' property in violation of the BTC are unrelated to Trejo's conduct challenged in the procedural due process claims.

Thus, Defendants fail to show that, as a matter of law, Trejo's alleged infringement of Plaintiffs' property interests in residing in the basement apartment and using and accessing their personal property was "random and unauthorized" government conduct such that only a post-deprivation opportunity to be heard was required.

### D. Qualified Immunity for the Procedural Due Process Claims

The Individual Defendants argue that even if the condemnation of the basement apartment and related bar on Plaintiffs' access to their personal property violated Plaintiffs' procedural due process rights, they are entitled to qualified immunity.

Qualified immunity is an affirmative defense that "shields government officials from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Matusak v. Daminski*, 165 F.4th 702, 708, 711 (2d Cir. 2026). In assessing qualified immunity, courts engage in a two-prong analysis to determine: "(1) whether the facts that a plaintiff has shown make out a violation of a constitutional right, and (2) whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 711. With respect to the second prong, "[e]ven if an [official] violated a plaintiff's clearly established rights, [the official] will still be entitled to qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights." *Baltas v. Chapdelaine*, 153 F.4th 328, 335 (2d Cir. 2025); *cf. Matusak*,

165 F.4th at 711 ("Under the 'clearly established' prong . . . we ask whether it was objectively reasonable for the [official] to believe that he acted lawfully, based on clearly established law and the information he possessed.").

Whether a right was clearly established at the pertinent time is a question of law that must be "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Clark v. Valletta*, 157 F.4th 201, 209 (2d Cir. 2025); *see also Kerman v. City of N.Y.*, 374 F.3d 93, 108 (2d Cir. 2004) ("The matter of whether a right was clearly established at the pertinent time is a question of law."). However, courts undertake this inquiry "in light of the specific context of the case . . . because clearly established law must be 'particularized' to the facts of the case." *Mutusak*, 165 F.4th at 712. Indeed, "courts generally need to identify a case where an officer acting under similar circumstances was held to have violated the Constitution" and the "relevant precedent must define the right with a high degree of specificity." *Zorn v. Linton*, No. 25–297, 607 U.S. __, 2026 WL 795469, at *2 (U.S. Mar. 23, 2026). "Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice." *Id.* Nonetheless, "[w]hile clearly established law should not be defined at a high level of generality," it would be an "error to demand the specificity of a factual twin" in the case law, as "the absence of a reported case with similar facts could demonstrate nothing more than widespread compliance." *Soukaneh v. Andrzejewski*, 112 F.4th 107, 123 (2d Cir. 2024); *see also McKinney v. City of Middletown*, 49 F.4th 730, 739 (2d Cir. 2022) (holding that the court need not find a case "directly on point to hold that a defendant's conduct violated a clearly established right," but "existing precedent must have placed the . . . constitutional question beyond debate").

"The matter of whether a defendant official's conduct was objectively reasonable, i.e., whether a reasonable official in the defendant's position would reasonably believe his conduct

58

did not violate a clearly established right, is a mixed question of law and fact." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). If there is a dispute as to the material facts, "the factual question[s] must be resolved by the factfinder." *Id.* "To that end, qualified immunity's protections apply regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Matusak*, 165 F.4th at 711. Nonetheless, "[a]ny mistake . . . must be 'reasonable.'" *Id*. Indeed, "officers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'known' that it proscribed their specific conduct." *Zorn*, 2026 WL 795469, at *2. However, because qualified immunity is an affirmative defense, "it is incumbent upon the defendant to plead and adequately develop" a qualified immunity defense. *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012), *cert denied*, 558 U.S. 1150 (2013); *see also Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (holding that the defendant bears the burden of proving qualified immunity on a motion for summary judgment).

With respect to the first step of the qualified immunity analysis, for the reasons set forth above, a reasonable jury could find that Trejo's actions violated Plaintiffs' procedural due process rights but not that Paccione's actions violated Plaintiffs' procedural due process rights. Accordingly, I only proceed to the second step of the qualified immunity analysis with respect to Plaintiffs' procedural due process claims against Trejo.

Defendants make two arguments in support of Trejo's invocation of qualified immunity against the procedural due process claims. First, they argue that the basement apartment "had a myriad of safety hazards that required immediate attention" and "[c]onsidering Defendant Trejo's understanding of what constitutes an 'unsafe structure' and 'unsafe equipment' in accordance with the NYSPM[C], her actions were not objectively unreasonable." (Mot. at 16.)

59

Second, they argue that Trejo furnished Plaintiffs with a list of accommodations where they could stay during the condemnation, that she outlined what needed to be done to lift the condemnation, and that after repairs were made, Plaintiffs returned to the property. (*Id.*) Although Defendants do not explain the relevance of this second argument to the qualified immunity analysis, I understand Defendants' second argument to be that it was objectively reasonable for Trejo to believe that she provided adequate process to Plaintiffs in light of her provision of a list of accommodations and notice concerning the repairs needed for the Sheas to move back to the apartment. Neither argument is persuasive.

Defendants' first argument boils down the position that it was objectively reasonable for Trejo to believe that she acted lawfully in not providing a post-deprivation hearing because she had a reasonable belief that any one of the "myriad of safety hazards that required immediate attention" constitutes an unsafe structure or unsafe equipment under the NYSPMC. *See Matusak*, 165 F.4th at 711 (describing the second step of the qualified immunity analysis as requiring a determination of whether "it was objectively reasonable for [the government official] to believe that [s]he acted lawfully, *based on clearly established law* and the information [s]he possessed" (emphasis added)). This argument fails on summary judgment, however, due to the existence of three material factual disputes.

First, there is a material question of fact as to precisely when Trejo made the decision to condemn the property, thereby preventing Plaintiffs from returning to their basement apartment and accessing their personal property. *See supra* Discussion § II.C.i.1.

Second, as explained above, there are material questions of fact as to which of the myriad safety hazards ultimately identified by Paccione in the issuance of a violation to Hanson or through discovery, other than suspected mold/mildew in the first floor, were actually known by

60

Trejo *at the time* she condemned the property and thereby prevented Plaintiffs from accessing the basement apartment and their personal property. *See supra Discussion* § II.C.i.2, 3. With respect to the alleged violations other than the suspected mold or registration requirements—lack of egress from two bedrooms, missing smoke and carbon monoxide alarms, tampering to an electrical panel, and various issues in the boiler room—the jury could conclude that Defendants only invoked these issues as after-the-fact justification for the failure to provide Plaintiffs an opportunity to be heard before condemning their home and evicting them from the premises. The standard for qualified immunity is "what a reasonable [building inspector] in [Trejo's] position would have believed, not what [Trejo] [herself] believed." *Outlaw*, 884 F.3d at 369. However, a reasonable building inspector in Trejo's position could only be aware of alleged violations that were evident *at the time* Trejo condemned the property.

For example, nothing in the present record demonstrates that Trejo was aware of the lack of egress from the basement apartment to the first floor at the time she knocked on the Shea's front door and informed Shea that she and her family had to leave the property while it was inspected and that they "might" not be able to come back. *See supra Discussion* § II.C.3.b.

Third, there is a material question of fact as to whether Trejo had a reasonable belief that the mold/mildew in the first-floor apartment presented an emergency warranting immediate condemnation of the property preventing Plaintiffs from accessing their home and property without a pre-deprivation opportunity to be heard. *See supra Discussion* § II.C.3.a.

These material factual disputes preclude a grant of qualified immunity to Trejo on the Fourteenth Amendment claims on the summary judgment record. These disputes must be resolved in order for the Court to determine whether it was objectively reasonable for Trejo to believe that her decision to condemn the basement apartment and related decisions to evict

61

Plaintiffs and prevent them from accessing their personal property were lawful in light of clearly established law and the information she possessed at the time. *See Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) ("[S]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."); *see also Perkowski*, 2021 WL 4408047, at *10 ("[G]iven the disputed facts whether exigent circumstances existed so that he and the Town could conduct a search of the Premises, the Court finds summary judgment on qualified immunity grounds is not warranted.").

Defendants' second argument relating to Trejo's invocation of qualified immunity from Plaintiffs' procedural due process claims—that it was objectively reasonable for Trejo to believe Plaintiffs were afforded an adequate opportunity to be heard where she provided them a list of potential accommodations and notice of repairs required to regain access to the basement apartment—is similarly unpersuasive. The Supreme Court has long recognized that a tenant's "continued residence in [their] home[]" is a "significant interest in property" that entitles the tenant to adequate process *prior* to an eviction. *Greene*, 456 U.S. at 444. It is also clearly established that individuals have a property interest in the household goods within their home. *See Fuentes*, 407 U.S. at 86. Under NYSPMC Sections 103.2 and 103.2.1, occupants of a structure may be removed where there is imminent danger "without first [being provided] an opportunity to be heard." However, "nothing" in the NYSPMC "relating to . . . condemnation of building or structures that are unsafe . . . shall be construed as authorizing" an occupant to be removed "without providing such notice and opportunity to be heard" as are constitutionally required. NYSPMC §§ 103.2, 103.2.1. In arguing that the procedural due process claims against Trejo are barred by qualified immunity, Defendants do not argue or show that the right to a hearing before being deprived of property interests in one's home and belongings is not clearly

62

established. Accordingly, Defendants fail to show that it is objectively reasonable for Trejo to believe that providing Plaintiffs a post-deprivation list of potential accommodations and notice of repairs required prior to return to their home provided Plaintiffs adequate opportunity to be heard under clearly established law.

Trejo is therefore denied summary judgment on Plaintiffs' procedural due process claims and these claims are not barred by qualified immunity.

### III.    Fourth Amendment Claim

Plaintiffs' next cause of action alleges that the Individual Defendants violated their Fourth Amendment rights by "evicting all plaintiffs thus *seizing* their home and personal property." (Compl. ¶ 56 (emphasis added).) Plaintiffs also argue in opposition to Defendants' motion that the Individual Defendants violated their Fourth Amendment rights by illegally entering Plaintiffs' basement apartment. (Opp'n at 8.)[26] However, the Complaint does not plead a Fourth Amendment claim for unlawful entry, and Plaintiffs have not amended the Complaint to include one. (*See* Compl.) Therefore, I consider only Plaintiffs' Fourth Amendment seizure claims.

The Fourth Amendment, which applies to the states through the Fourteenth Amendment, protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection exists in both the criminal and civil context and includes governmental searches and seizures carried out to enforce municipal housing codes. *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 539 (1967); *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 69 (1992); *see also Airbnb, Inc. v. City of New*

---

[26] The Complaint only alleges that Defendants *seized* Plaintiffs' home and property and not that Defendants unlawfully *searched* the home. (Compl. ¶ 56.)

*York*, 373 F. Supp. 3d 467, 487 (S.D.N.Y. 2019) (collecting cases). Therefore, where a person asserts a Fourth Amendment claim challenging the seizure of their home, "the right against unreasonable seizures . . . [is] no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all." *Soldal*, 506 U.S. at 69.

Whatever the case, "the first step" in any Section 1983 claim for unlawful seizure under the Fourth Amendment "is to determine whether there has been a constitutionally cognizable seizure." *Barlow v. Male Geneva Police Officer who Arrested me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (quoting *Medeiros v. O'Connell,* 150 F.3d 164, 167 (2d Cir. 1998)). If there was, the court must then determine whether the seizure was unreasonable. *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013).

Here, Defendants argue that there is "no practical distinction" between Plaintiffs' Fourth and Fourteenth Amendment claims and therefore suggest that I should not separately analyze the Fourth Amendment claims. (Mot. at 13.) However, the Supreme Court has discouraged courts from treating Fourth Amendment seizure and Fourteenth Amendment procedural due process claims as synonymous, holding instead that courts should "examine each constitutional provision in turn." *Sodal*, 506 U.S. at 70 ("Certain wrongs affect more than a single right . . . [but] [w]here such multiple violations are alleged, we are not in the habit of identifying as a preliminary matter the claim's 'dominant' character"). I therefore separately assess Plaintiffs' Fourth Amendment seizure claims, which Plaintiffs bring for unlawful seizure of their residence and personal property.

A.  Unlawful Seizure of Plaintiffs' Residence

Defendants do not move for summary judgment on Plaintiffs' seizure of residence claims except to argue that there is "no practical distinction" between the Fourth and Fourteenth Amendment claims. For the following reasons, Defendants have shown that there is no material dispute of fact that Paccione seized Plaintiffs' home but, construing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Trejo unreasonably seized Plaintiff's home.

*i. Did Defendants Seize Plaintiffs' Residence?*

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also In re 650 Fifth Ave. Co.*, 991 F.3d 74, 77–78 (2d Cir. 2021); *Bruno v. City of Schenectady*, 727 F. App'x 717, 719 (2d Cir. 2018). As to real property, that does not require "physical possession" but can occur where the government takes "all management rights" pertaining to the property, such as "rights pertaining to the use, possession, and enjoyment of the property." *In re 650 Fifth Ave. Co.*, 991 F.3d at 78 (defining a seizure for purposes of a procedural due process claim based on *Jacobsen*, 466 U.S. at 113). That is consistent with the longstanding principle that "retreat into [one's] own home" is "at the very core of the Fourth Amendment," and therefore being "unceremoniously dispossessed of one's home" is clearly a Fourth Amendment seizure. *Soldal*, 506 U.S. at 61.

As a result, courts in this Circuit have repeatedly held that it is a Fourth Amendment seizure when a municipal agent condemns a property, or even when the agent temporarily ejects from the property a person living there. *See McCrae v. Town of Brookhaven*, 759 F. Supp. 3d 372, 391 (E.D.N.Y. 2024); *Bonner*, 2023 WL 6812276, at *3; *Perkowski*, 2021 WL 4408047, at

65

*6; *see also Greene v. David*, 41 F. Supp. 2d 167, 171 (N.D.N.Y. 1999), *aff'd*, 199 F.3d 1322 (2d Cir. 1999) ("The Court has no trouble concluding that a forced ejection from property, even for a brief period, constitutes such an interference and thus a seizure of property.").[27] Courts have reached this determination in multiple cases brought against the Town. *McCrae*, 759 F. Supp. 3d at 391; *Bonner*, 2023 WL 6812276, at *3; *Perkowski*, 2021 WL 4408047, at *6.

Here, Defendants do not expressly move for summary judgment on the ground that Trejo did not seize the subject property, nor could they. (*See* Mot. at 13–15.) All parties agree that she "temporarily condemned the [r]esidence until . . . corrective measures were addressed." (SMF ¶ 40; CSMF ¶ 40.) It is also undisputed that Trejo placed pad-locks and condemnation notices on the doors. (Trejo Complaint at 27–29.) Plaintiffs also submit testimony that Trejo called the police and threatened to jail Plaintiffs and "get [their] kids taken away" if they did not vacate the apartment. (F. Shea Dep. 43:13–17; J. Shea Dep. 13:21–14:22; Hansen Dep. 14:14–21.) In light of this evidence, a reasonable jury could find that Trejo "dispossessed [Plaintiffs] of [their] home." *Soldal*, 506 U.S. at 61. By contrast, for the same reasons that Plaintiffs abandoned their procedural due process claims against Paccione, they have also abandoned their Fourth Amendment claims against her. *See supra*, Discussion II.B. Moreover, as explained, although Paccione issued BTC violations to Hansen, Plaintiffs have not identified any evidence creating a genuine dispute of material fact as to whether Paccione participated in the decision to order Plaintiffs to immediately vacate their home.

---

[27] This conclusion is also consistent with decisions by other circuits. *See, e.g.*, *Gaetjens v. City of Loves Park*, 4 F.4th 487, 492 (7th Cir. 2021) (holding that defendants seized a plaintiff's home by "placing a condemnation placard on it"); *Flatford v. City of Monroe*, 17 F.3d 162, 170 (6th Cir. 1994) (holding that a the Fourth Amendment entitled individuals "to pre-eviction judicial oversight in the absence of emergency circumstances").

Defendants also do not explicitly assert that a month-to-month lease does not create a sufficient possessory interest to support a cognizable Fourth Amendment claim, but they argue that there is "no practical distinction" between Plaintiffs' Fourth and Fourteenth Amendment claims. (Mot. at 13.) Accordingly, I make clear that such an argument is foreclosed by longstanding Supreme Court and Second Circuit precedent. *See, e.g.*, *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (holding that whether a plaintiff has standing to bring a Fourth Amendment claim "depends not upon a *property right* in the invaded place but upon whether the person who claims the protection of the Amendment has a *legitimate expectation of privacy* in the invaded place" (emphasis added)); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (a person's expectation of privacy can be demonstrated "by showing that [the plaintiff] owns the premises or property subjected to search . . . or by showing that [the plaintiff] occupies and has dominion and control over the premises or property *by leave of the owner*." (emphasis added)); *see also* *McCrae v. Town of Brookhaven*, 759 F. Supp. 3d 372, 390 (E.D.N.Y. 2024) (holding that a plaintiff with a "valid lease to rent [a] home from the homeowner" has standing to bring a Section 1983 claim for "unlawful seizure of his residence" under the Fourth Amendment). Accordingly, a reasonable jury could conclude that Trejo seized Plaintiffs' home, but there is no genuine dispute of fact as to whether Paccione did so.

### ii. Was the Seizure Reasonable?

I consider Defendants' argument that the seizure of the property was reasonable. "The ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014). To determine whether a seizure is unreasonable, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interest alleged to justify the intrusion and determine whether the

67

totality of the circumstances justified the particular sort of seizure." *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). "Although . . . civil searches and seizures need not satisfy the Warrant Clause requirements governing criminal searches," municipal inspectors must ordinarily "obtain an administrative warrant that satisfie[s] a relaxed probable cause standard." *Airbnb, Inc.*, 373 F. Supp. 3d at 486–487 (discussing *Camara*, 387 U.S. at 538–39 and collecting subsequent cases). The Supreme Court most recently addressed the administrative warrant requirement in *City of Los Angeles v. Patel*, 576 U.S. 409, 420 (2015). As the Court there held, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." 576 U.S. at 420. In cases involving municipal code enforcement, this rule is guided by a concern that the law not "leave the occupant [of a dwelling] subject to the discretion of the official in the field." *Camara*, 387 U.S. at 532. Nonetheless, "where special needs make the warrant and probable-cause requirement impracticable, and where the primary purpose of the search[] [or seizure] is distinguishable from the general interest in crime control," a warrant is not required. *Patel*, 576 U.S. at 420; *see also Camara*, 487 U.S. at 539 (reasoning that nothing in the administrative warrant requirement is intended to "foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in emergency situations.").

Accordingly, although the Second Circuit has not confronted the issue, other circuits have held that individuals are "entitled to pre-eviction judicial oversight in the absence of emergency circumstances" but that a warrantless eviction is permissible where a reasonable basis exists for believing that conditions "pose[] an immediate danger to [the premises'] occupants." *Flatford v. City of Monroe*, 17 F.3d 162, 171 (6th Cir. 1994); *see also Gaetjens v. City of Loves Park*, 4

68

F.4th 487, 494 (7th Cir. 2021) (holding that a warrantless evacuation of a property does not violate the Fourth Amendment where inspectors have an "objectively reasonable basis for believing that a safety threat require[s]" condemnation of a structure without a warrant). However, even where an administrative warrant is not required, the seizure must still be reasonable. *Soldal*, 506 U.S. at 71; *Ferreira*, 56 F. Supp. 3d at 231.

To determine whether a seizure is reasonable, a court must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion" and determine whether "the totality of the circumstances justified the particular sort of . . . seizure." *Carroll*, 712 F.3d at 651. In cases involving seizure of a person's home, this analysis is largely identical to whether the deprivation of the person's home satisfied due process. *See Soldal*, 506 U.S. at 71 (analogizing the reasonableness analysis under the Fourth Amendment to a "careful balancing of governmental and private interests" in the procedural due process context); *Ferreira*, 56 F. Supp. 3d at 231 ("[A] municipality's adherence to standards comporting with due process 'suggests the Fourth Amendment reasonableness.'").

Consistent with that authority, Defendants argue that the seizure of Plaintiffs' home was reasonable for the same reasons that they argue that Plaintiffs were not entitled to pre-deprivation notice and a hearing before the condemnation of their home. (Mot. at 13–15.) Because genuine disputes of material fact exist as to whether Trejo arbitrarily invoked emergency procedures to condemn Plaintiffs' home, genuine disputes of material fact also exist regarding whether an exigency supported the exception to the warrant requirement and whether Trejo's seizure of Plaintiffs' home was reasonable. *See supra* Discussion § II.C.i. Accordingly, a reasonable jury could find that Trejo seized Plaintiffs' home in violation of their Fourth Amendment rights.

69

B.  Unlawful Seizure as to Plaintiffs' Personal Property

### i.  Did Defendants Seize Plaintiffs' Personal Property?

Plaintiffs allege that Defendants illegally seized their personal property from inside the residence by ejecting Plaintiffs before they could collect their property and subsequently locking Plaintiffs out of the residence. (Compl. ¶ 56; Opp'n at 8, 10.) Where a plaintiff brings a Section 1983 claim for seizure of personal property, the plaintiff must meet the same standard that applies to seizure of a residence—i.e., for a seizure to occur, there must be "some meaningful interference with an individual's possessory interest in [the] property." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d Cir. 2004) (citing *Jacobsen*, 466 U.S. at 113). "Interference can occur even when the government does not ultimately come to possess the property." *McCrae*, 759 F. Supp. 3d at 391 (quoting *Bonner*, 2023 WL 6812276, at *4). Moreover, when a person is forced to leave a location "without retrieving all [their] belongings," the person does not lose "all possessory interest in any personal effects." *Shaul*, 363 F.3d at 185 (holding that a teacher who was suspended did not lose "all possessory interest in" his personal belongings). For this reason, other judges of this District have held in two cases brought against the Town of Brookhaven that where a "town board[s] up a building and prevent[s] plaintiffs from accessing their personal property," this conduct "may rise to the level of a [Fourth Amendment] seizure." *McCrae*, 759 F. Supp. 3d at 391 (citing *Bonner*, 2023 WL 6812276, at *4); *Bonner*, 2023 WL 6812276, at *4.

However, courts recognize several constraints on what constitutes a seizure of personal property in these situations. For example, where "an initial seizure of property was reasonable, defendants' failure to return the items does not, by itself, state a separate Fourth Amendment claim of unreasonable seizure." *Shaul*, 363 F.3d at 187 (holding that where a suspended teacher

70

alleged that his former school had returned his personal property, with some of his personal belongings missing, that "[t]o the extent the Constitution afford[ed]" the teacher "any right with respect to a government agency's retention of lawfully seized property, it would appear to be procedural due process."). Likewise, where government agents "temporarily prevent [a person] from entering her home," that restraint does not always "constitute the officials' seizure of the contents of [the] home." *Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018). In *Bruno*, for example, the Second Circuit held that fire officials did not seize the contents of a plaintiff's home when they temporarily prevented her from entering while the "premises was still under investigation." *Id.* at 720.

In moving for summary judgment on the Fourth Amendment claim relating to the alleged seizure of Plaintiffs' personal property, Defendants make the three arguments addressed above— i.e., they argue (1) that Trejo "impeded the Plaintiffs' use of said property" but did not seize it; (2) that Plaintiffs have not shown a dispute of fact as to whether Paccione was involved in the condemnation of Plaintiffs' home; and (3) that Frankie Shea accessed the residence on three occasions to retrieve personal property and Joseph Shea returned around five to six times to retrieve property. (Mot. at 14, 17 (citing CSMF ¶¶ 46, 48).) Plaintiffs argue that this first argument was rejected by the Court in *Bonner*, and they dispute the extent to which Plaintiffs were able to access the property. (Opp'n at 8–9.) Plaintiffs do not respond to Defendants' argument that Paccione did not condemn Plaintiffs' home. On reply Defendants attempt to distinguish *Bonner* noting that the defendants argued in that case that the plaintiffs had remained in the home for four days after the condemnation, which allowed time to retrieve their belongings, and that the court denied a motion to dismiss, which permitted further discovery.

71

(Reply at 6.) Here, Defendants argue that discovery demonstrates that Plaintiffs were able to recover their belongings. (*Id.*)

Even if Trejo did not remove Plaintiffs' personal property from the home, Trejo did carry out "some meaningful interference with an individual's possessory interest in [the] property" by locking it inside Plaintiffs' condemned home. *Shaul*, 363 F.3d at 185. I find persuasive the decisions in this District in which courts have held that ordering occupants to vacate a home without providing sufficient opportunity to collect their personal property may constitute a Fourth Amendment seizure. *See McCrae*, 759 F. Supp. 3d at 391 (ordering plaintiffs to vacate a home without sufficient time to retrieve personal belongings is a Fourth Amendment seizure); *Bonner*, 2023 WL 6812276, at *4 (concluding that an order requiring plaintiffs to vacate their home and preventing them from accessing their personal property is a Fourth Amendment seizure). There is also a genuine dispute of material fact that would permit a reasonable jury to find that Trejo's actions constituted a seizure. Frankie Shea testified in deposition that Trejo gave her only one hour to "gather things together to leave" or otherwise face arrest. (F Shea Dep. 44:8–11, 48:5–6.) Hansen likewise testified in deposition that on the day of the condemnation, Trejo told him that "everyone has to leave and if you're seen on the property, you will be arrested." (Hansen Dep. 14:14–18.) He further testified that for the next ten days, if he was at the home, whether alone or with the Sheas, Trejo "would show up and call the cops and tell us that we would get arrested for trespassing and then . . . before the cops got there, she would take off." (*Id.* 14:18–23.) Moreover, this case is distinguishable from *Bruno* because there are genuine disputes of material fact as to whether the initial seizure of Plaintiffs' home was reasonable, and therefore, as to whether the initial act of preventing Plaintiffs from entering their home was

justified by any investigation of the premises. 727 F. App'x at 720. It is therefore for the jury to decide whether Trejo's conduct constituted a seizure of Plaintiffs' personal property.

By contrast, Plaintiffs have abandoned their Fourth Amendment seizure of personal property claim against Paccione. For the same reasons set forth with respect to Plaintiffs' other claims against Paccione, Plaintiffs have not identified a genuine dispute of material fact as to whether Paccione participated in the decision to condemn the home and lock up Plaintiffs' personal property inside, nor have they identified evidence in the record showing that she restricted Plaintiffs' access to their property afterwards. Accordingly, summary judgment is granted to Paccione as to Plaintiffs' Fourth Amendment seizure of personal property claim.

### ii.  *Was the Seizure Reasonable?*

Here, whether Trejo's alleged seizure of Plaintiffs' personal property was reasonable turns on the reasonableness of the seizure of the entire home, since Defendants provide the same justification of alleged exigent circumstances for both the seizure and locking up of the home and the related restrictions on Plaintiffs' ability to access to their personal property. (*See* Mot. at 13–15 (failing to distinguish between a claim for seizure of Plaintiffs' home and seizure of the property inside and making the same arguments for both).) Therefore, because there are genuine disputes of material fact regarding whether exigent circumstances justified Trejo's act of condemning the property, genuine disputes of material fact also exist as to whether Trejo's conduct in restricting Plaintiffs' access to their personal property was reasonable. *See supra* Discussion § III.A.ii.

### C.  Qualified Immunity Against the Individual Defendants Regarding the Seizure Claims

Finally, Defendants move for summary judgment on the Fourth Amendment claims on the basis of qualified immunity. Because Defendants invoke qualified immunity with respect to

all of their claims together, however, they fail to make any *specific* argument as to why they merit qualified immunity on the Fourth Amendment claims as distinct from those raised with respect to Plaintiffs' Fourteenth Amendment claims. (Mot. at 15–16.)

Accordingly, at this stage of the proceedings, qualified immunity does not bar the Fourth Amendment claims against Trejo for the same reasons that qualified immunity does not bar the procedural due process claims against Trejo. Because there are material disputes of fact as to which violations Trejo had identified at the time she seized Plaintiffs' home and personal property, a reasonable jury could conclude that it was not objectively reasonable for Trejo to believe that an exigency existed such that she could seize Plaintiffs' home and personal property, based on clearly established law and the information she possessed at the time of seizure. Moreover, I agree with Judge Morrison's determination in *McCrae*, 759 F. Supp. 3d at 394, which involved similar Fourth Amendment claims against the Town, that it was clearly established at the time that the property in that action was condemned that the failure to provide a resident with a reasonable opportunity to collect their personal property infringed on the resident's Fourth Amendment rights. *McCrae*, 759 F. Supp. 3d at 394. Here, because there are questions of fact as to precisely when Trejo condemned the property and how much time Plaintiffs were provided before being evicted from the property, I cannot conclude that it was objectively reasonable for Trejo to believe that her seizure of the basement apartment or the personal property located within it was lawful based on clearly established law and the information she had at the time.

Thus, at this stage of the proceedings, qualified immunity does not bar Plaintiffs' Fourth Amendment claims against Trejo for seizure of Plaintiffs' home and personal property. By

74

contrast, summary judgment is granted to Paccione with respect to all of Plaintiffs' Fourth Amendment claims.

**IV.    Conspiracy to Unreasonably Seize and Deprive McCrae of His Residence and Personal Property**

To prove a conspiracy under Section 1983, a plaintiff must show three things: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). A plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). However, "conspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *McCrae*, 759 F. Supp. 3d at 396.

Here, because summary judgment is granted with respect to Plaintiffs' Fourth and Fourteenth Amendment claims against Paccione for lack of personal involvement, Plaintiffs cannot show a genuine dispute of material fact as to whether Trejo and Paccione agreed to act in concert to inflict an unconstitutional injury. *Pangburn*, 200 F.3d at 72. Even were that not the case, however, summary judgment would still be warranted.

The entirety of Plaintiffs' argument on their conspiracy claim is that "defendants Trejo and Paccione agreed to remove the plaintiffs from their home. Those defendants then enlisted the help of Suffolk County police officers to complete their goal. The defendants were well aware of the unconstitutional injury." (Opp'n at 11.) Preliminarily, Defendants argue that any claims that Defendants Trejo and Paccione conspired to violate Plaintiffs' rights are barred by the "intra-corporate doctrine." (Mot. at 17.)

75

Under the intra-corporate doctrine, "officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *McCrae*, 759 F. Supp. 3d at 396. Although the Second Circuit has recognized the "intra-corporate doctrine in the context of a § 1985 claim . . . [t]o date, [it] has not yet applied the doctrine in § 1983 cases." *Id.* (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)). However, courts in this Circuit have repeatedly applied the doctrine to Section 1983 cases. *See, e.g.*, *id.*; *Jordan v. Wright*, No. 24-cv-1166, 2024 WL 3742767, at *8 (D. Conn. Aug. 9, 2024); *Dowd v. DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018). Another judge in this District held in a case involving substantially similar facts that the intra-corporate doctrine barred a Section 1983 conspiracy claim against Paccione for an alleged conspiracy with other Town of Brookhaven employees. *McCrae*, 759 F. Supp. 3d at 396.

Plaintiffs' conspiracy claim for actions between Paccione and Trejo is barred by the intra-corporate doctrine for the same reasons as those set forth in *McCrae*. Accordingly, summary judgment is granted on Plaintiffs' Section 1983 conspiracy claim.[28]

## V.      Municipal Liability Under *Monell*

In *Monell v. Department of Social Services*, the Supreme Court established that "municipalities and other local government units" are "persons" who may be liable under Section 1983. 436 U.S. at 690. Still, "a municipality cannot be held liable under [Section] 1983 on a *respondeat superior* theory." *Id.* at 691. In other words, the plaintiff must show that,

---

[28] Although Plaintiffs allege that the Individual Defendants enlisted Suffolk County Police officers to violate Plaintiffs' rights, no Suffolk County Police Officers are named on the conspiracy count. Plaintiffs' conclusory argument that Defendants "enlisted the help of Suffolk County police officers" is insufficient to show an "agreement, express or tacit" to act in concert to violate Plaintiffs' procedural due process and/or Fourth Amendment rights. *Webb*, 340 F.3d at 110.

"through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (emphasis in original). Accordingly, in order to bring a *Monell* claim against a municipality or other local government unit, the plaintiff must allege facts supporting: "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023). A plaintiff may establish the existence of a municipal policy giving rise to *Monell* liability in four different ways:

> (1) a formal policy endorsed by the municipality . . . ; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy . . . ; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware . . . ; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees.

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589–90 (2d Cir. 2019); *see also Savarese v. City of New York*, 547 F. Supp. 3d 305, 354 (S.D.N.Y. 2021).

Plaintiffs advance three theories in support of the *Monell* claim, but do not distinguish between these theories in their opposition briefing. First, the Complaint alleges that it was the "policy and custom" of the Town to "authorize, encourage, permit, or tolerate certain employees," including Trejo and Paccione, "to engage in illegal and biased administration of law and services," which purportedly caused the violation of Plaintiffs' constitutional rights and their asserted injuries. (Compl. ¶¶ 66, 68–69.) Although framed as challenging a "policy *or* custom" Plaintiffs do not attempt to identify any formal written policy or decision of the Town's policymakers. Rather, in opposing summary judgment, Plaintiffs present a custom theory of *Monell* liability, arguing that the Town "has multiple cases pending against it, all sounding in the same violation, illegal removal of residents from their homes and preventing them from retrieving their personal property after seizing their residence." (Opp'n at 12.)

Second, Plaintiffs also bring *Monell* claims on failure-to-supervise and failure-to-train theories. (*See* Compl. ¶ 67 (alleging that the Town "and their supervisors refused to adequately train, direct, supervise, or control defendants so as to prevent the policies and customs that resulted in the violations of plaintiffs' constitutional rights").) Failure-to-supervise and failure-to-train theories of *Monell* liability "attribute [a] subordinat[e's] conduct to the actions or omissions of higher ranking officials with policymaking authority" based on a policymaking official's "deliberative indifference to constitutional deprivations caused by subordinates." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir. 2004). However, the Second Circuit has explained that "these theories emphasize different facts and require different showings in order to establish deliberative indifference" and must therefore "be analyzed independently." *Id.* at 127. Nonetheless, Plaintiffs conflate the two and argue that their *Monell* claims brought on failure-to-supervise and failure-to-train theories survive summary judgment, again pointing to the existence of lawsuits pending against the Town involving similar allegations to those present here and Incagliato's testimony in another action that he was aware of "complaints" against Trejo, which he forwarded to Deputy Town Attorney Moran. (*Id.*) Plaintiffs appear to argue that the existence of the other lawsuits and Incagliato's deposition testimony give rise to genuine disputes of material fact as to whether the Town has shown deliberate indifference to the constitutional deprivations alleged by Plaintiffs, whether the Town failed to adequately supervise and train Trejo, and whether such failures were the proximate cause of the violation of Plaintiffs' constitutional rights. (*See* Opp'n at 12.)

For the reasons that follow, Plaintiffs have failed to identify specific evidence in the record raising a genuine dispute of material fact as to the existence of the asserted custom and failure-to-train theories of *Monell* liability. However, the record raises a genuine dispute of

78

material fact as to whether Plaintiffs' alleged constitutional violations resulted from Town policymakers' failure to supervise Trejo in her conduct of condemning properties, evicting residents, and barring them from accessing their personal property in the condemned properties. Accordingly, summary judgment is granted to the Town on the *Monell* claims based on custom and failure-to-train theories but is denied to the Town on the *Monell* claim premised on a failure-to-supervise theory.

### A. Custom

In order to establish *Monell* liability based on a custom theory, the plaintiff must establish "an unwritten practice that is so widespread as to have the force of law." *Agosto*, 982 F.3d at 98. Such a theory does not require "an express rule or regulation that embodies the alleged unconstitutional practice among subordinate municipal employees." *Hu v. City of New York*, 927 F.3d 81, 106 (2d Cir. 2019). However, the plaintiff must show a "practice by a subordinate municipal employee (or employees) other than a policymaker" that is "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Lucente v. Cnty. of* Suffolk, 980 F.2d 284, 297–98 (2d Cir. 2020). In other words, there must be a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989); *see also Tieman v. City of Newburgh*, No. 13-cv-4178, 2015 WL 1379652, at *16 (S.D.N.Y. Mar. 26, 2015).

Under this standard, "instances of reprehensible and at times illegal and unconstitutional conduct by individual [government officials]" are not enough absent evidence that such conduct was "so *widespread* as to support an inference that it must have been known and tolerated by supervisors." *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012) (emphasis added). For example, in considering a *Monell* claim against the East Haven Police Department for an alleged

79

custom of discriminatory police abuse in *Jones*, the Second Circuit held that "two instances [of unlawful conduct], or at the most three, over a period of several years, in which a small number of officers abused the rights of [B]lack people" fell short of establishing conduct "so persistent" as to constitute a custom. *Id.* at 85. Likewise, in *Hu*, the Second Circuit affirmed the dismissal of a *Monell* claim alleging a custom of discriminatory enforcement of New York City's building codes by the City's Assistant Chief Inspector and other Department of Building ("DOB") employees because the amended complaint "only identifie[d] four instances in which the plaintiffs were alleged to have been unfairly sanctioned by DOB." *Hu*, 927 F.3d at 106. In doing so, the Second Circuit found critical that the amended complaint "did not allege how many DOB employees were involved in the scheme, whether these accomplices represented a large or small share of DOB inspectors or personnel, the frequency with which [they] assisted in discriminatory enforcement actions, or any other facts that might indicate the extent to which DOB personnel helped [the Assistant Chief Inspector] carry out" the challenged conduct. *Id.* The Court reasoned that this made it "entirely unclear whether" the challenged conduct was "the product of a few rogue officials, a department-wide effort, or something in between." *Id.*

In moving for summary judgment, Defendants rely upon *Jones* and a series of district court decisions holding that "mere citations to lawsuits, even if they did involve comparable conduct, do not *alone* establish a custom or practice that is widespread and persistent" as required to establish municipal policy through custom, "particularly if the lawsuits did not result in an adjudication of liability." *Bethune v. Westchester Cnty.*, No. 18-cv-3500, 2020 WL 1032508, at *5 (S.D.N.Y. Mar. 2, 2020) (emphasis supplied); *see also* Mot. at 21–22; *Tieman*, 2015 WL 1379652, at *16 (collecting cases for the proposition that mere reference to other lawsuits do not plausibly allege a custom where those actions involve conduct "different from

80

the misconduct alleged in the complaint, post-dated the alleged misconduct in the case at hand, or involved "something less . . . than evidence of misconduct," such as "settlements without admissions of liability").

To be clear, *Jones* is distinguishable from this action. The Second Circuit held in *Jones* that there were "no instances in which supervisors were aware of abuse" by defendants, which is not the case here, where evidence raises genuine questions of material fact as to whether Town Senior Building Inspector Incagliato and/or Deputy Town Attorney Moran were Trejo's supervisors and were aware of complaints that she was violating people's rights in carrying out her duties as a building inspector to condemn residential properties. *See infra*, Discussion § V.B. The district court cases on which Defendants rely are likewise distinguishable because Plaintiffs *have* identified one case that resulted in an "adjudication of liability." *Bethune*, 2020 WL 1032508, at *5. Specifically, *Perkowski v. Town of Brookhaven*, No. 18-cv-5480 (E.D.N.Y.), resulted in a jury verdict finding Incagliato liable for conduct similar to that alleged against Trejo here. *See* Verdict Sheet (ECF No. 86), *Perkowski*, 18-cv-5480. These facts add weight to the existence of four other similar cases against the Town for conduct arising out of the condemnation of residential properties and related treatment of residents, which were either settled following a partial denial of summary judgment, *McCrae*, 759 F. Supp. 3d at 400, or remain ongoing, *see supra* note 7. Moreover, although only two of the cases involved conduct that is alleged to have occurred *before* Trejo condemned Plaintiffs' property on October 24, 2018, another action involved conduct alleged to have taken place just one month later, in November 2018, and all five actions involve conduct alleged to have occurred in a span of just four years. *Compare Perkowski*, 2021 WL 4408047, at *1 (alleging unconstitutional conduct by the Town in June 2016) and *McCrae*, 759 F. Supp. 3d at 400 (same in December 2017), *with*

Complaint ¶ 2, *Spradley*, No. 19-cv-175 (same in November 2018), *Corrigan*, 2023 WL 7003936, at *1 (same in August 2019), and Complaint ¶ 4, *Bonner*, 22-cv-4690 (E.D.N.Y. filed August 8, 2022), ECF No. 1 (same in August 2019).

*Perkowski* is particularly significant because it resulted in a verdict, concerned similar conduct that pre-dated the events in question in this action, and challenged conduct by Incagliato, who is "*the* senior building inspector" for the Town. (Incagliato Dep. 30:10–11 (emphasis added).) The complaint in *Perkowski* alleges that Incagliato entered the plaintiff's home without permission, condemned the property, ordered the residents to vacate the apartment under threat of arrest, and refused the occupants' requests to retrieve their personal property. (Complaint, ECF No. 1, *Perkowski*, 18-cv-5480, ¶¶ 44, 46, 48–49, 53–54.) Similar to here, the complaint also alleges that the residents returned to find their home vandalized and a garden hose running into the basement. (*Id.* ¶¶ 51, 59.) At trial, the jury found Incagliato liable for unlawful seizure of the plaintiff's property in violation of the Fourth Amendment and awarded $100,000 in compensatory damages. Verdict Sheet, ECF No. 86, *Perkowski*, 18-cv-5480; Trial Tr., ECF No. 104 at 683, *id*.

The number of similar cases brought against the Town in a four-year span of time concerning alleged constitutional violations related to the practice of condemning residential properties, evicting residents, and barring residents from accessing their personal property is troubling. However, it is Plaintiffs' responsibility to develop the record to support *Monell* claims based on a custom theory. Plaintiffs appear to have engaged in virtually no discovery to support these claims. The only evidence Plaintiffs cite beyond the cases discussed here is Incagliato's deposition testimony in *Spradley*. (*See* Incagliato Dep.) If Plaintiffs deposed Incagliato or Moran in the course of this litigation, they have not submitted any such testimony nor have they

82

submitted any documentary evidence that would raise a question of fact as to whether Trejo's alleged conduct is widespread. Plaintiffs also have not submitted any evidence raising a question of fact as to "how many [Town] employees were involved in the [custom they challenge], [or] whether these [individuals] presented a large or small share of [Town] inspectors or personnel." *Hu*, 927 F.3d at 106. Trejo and Incagliato are the only building inspectors and town investigators named in each of the cases on which Plaintiffs rely, with the exception of *McCrae*, which names Paccione, another town investigator, and another building inspector. *See Perkowski*, 2021 WL 4408047, at *1; *McCrae*, 759 F. Supp. 3d at 400; Complaint, *Spradley*, No. 19-cv-175; *Corrigan*, 2023 WL 7003936, at *1; Complaint, *Bonner*, 22-cv-4690 (E.D.N.Y. filed August 8, 2022), ECF No. 1.

Accordingly, Plaintiffs have not identified evidence supporting a genuine dispute of material fact as to whether the challenged conduct by Trejo was "the product of a few rogue officials, a department-wide effort, or something in between." *Hu*, 927 F.3d at 106. Accordingly, the summary judgment record, viewed in the light most favorable to Plaintiffs, fails to raise a question of fact as to whether the challenged practices related to the condemnation of residential properties and related treatment of residents is "so manifest as to imply the constructive acquiescence of senior policy-making officials," *Lucente*, 980 F.2d at 297–98, and thereby constitutes the Town's "standard operating procedure," *Jett,* 491 U.S. at 737. Summary judgment is therefore granted to Defendants on Plaintiffs' *Monell* claims based on a custom theory.

B.  Failure-to-Supervise

To make out a *Monell* claim for failure-to-supervise, the plaintiff must establish: (1) that defendants "should have known their inadequate supervision was likely to result in the alleged deprivations so as constitute deliberate indifference"; (2) "obvious and severe deficiencies in the

. . . defendants' supervision that reflect a purposeful rather than negligent course of action"; and (3) "a causal relationship between the failure to supervise and the alleged deprivations to plaintiffs." *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007).

With respect to the first element of a failure-to-supervise claim, deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[D]eliberate indifference need not be proven by any particular method, and need not involved allegations of a repeated failure to act"; even an "isolated act" of unlawful conduct "might be sufficient to allow a factfinder to infer deliberate indifference if [it was] so extreme as to leave no doubt that [the defendant] consciously chose not to act." *Amnesty Am.*, 361 F.3d at 129 & n.9 (not deciding if this standard was met). A showing of deliberate indifference requires a plaintiff first to establish the circumstances that "give rise to a defendant supervisor's duty to act." *Reynolds*, 506 F.3d at 192 (discussing *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992)). A plaintiff "must establish also that [the] defendant breached its duty to act." *Reynolds*, 506 F.3d at 193. To meet this burden, "plaintiffs' evidence must establish only that a policy making official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' . . . and the policymaker's failure to investigate or rectify the situation evidence[d]" a "conscious choice rather than mere negligence." *Amnesty Am.*, 361 F.3d at 128.

With respect to a *Monell* failure-to-supervise theory, the number of claims brought by other persons "together with evidence as to the [municipality's] treatment of [those] claims" is relevant *regardless* of "[w]hether or not the claims had validity, [because] the very assertion of a number of such claims put the City on notice that there was a possibility" that its employees had

84

engaged in unconstitutional conduct. *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986); *see also Miehle-Kellogg v. Doe*, No. 19-cv-4943, 2023 WL 2632452, at *8 (E.D.N.Y. Mar. 24, 2023) ("Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate."). In the context of a failure-to-train theory of municipal liability, the Supreme Court has held that prior incidents must be "similar to the violation at issue" to put the municipality on notice and "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city and the opportunity to conform to constitutional dictates." *Connick*, 563 U.S. at 62, 63 & n.7 (concluding that past *Brady* violations did not create sufficient notice because "none of [the] cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence").

With respect to the second and third elements of a failure-to-supervise claim, although a plaintiff is not required to "specify obvious supervisory deficienc[ies]," where the plaintiff alleges more than an isolated incident of non-supervision, the plaintiff must "identify with specificity the inadequacies giving rise to their claim." *Reynolds*, 506 F.3d at 193 (citing *Amnesty*, 361 F.3d at 127 n.8, 128). The plaintiff must also establish policymakers' "reaction" to the alleged constitutional violation. *Amnesty Am.*, 361 F.3d at 126 n.8. As with all *Monell* claims, the plaintiff must also show that the policy at issue—here, one based on failure to supervise— "actually caused or was the moving force behind the alleged violations." *Reynolds*, 506 F.3d at 193; *Friend*, 61 F.4th at 93 (requiring a demonstration of causation for all *Monell* claims).

Applying these standards here, the record gives rise to genuine questions of material fact sufficient to overcome summary judgment on Plaintiffs' claim that the Town is liable under *Monell* because the alleged violation of their constitutional rights resulted from Town

85

policymakers' failure to supervise employees conduct in the condemnation of residential properties and related eviction of resident.

First, there are questions of fact as to whether Town Senior Building Inspector Incagliato or Deputy Town Attorney Moran served as Trejo's supervisor at the time of the events in question. Defendants do not contest that Incagliato and Moran are "high[] ranking official[s] with policymaking authority" for the Town. *Amnesty Am.*, 361 F.3d at 127. Ample evidence in the record raises a genuine question of material fact as to whether Incagliato served as Trejo's direct supervisor in her work to condemn residential properties. (*See* Incagliato Dep. 30:10–11 (affirming that Incagliato was "*the* senior building inspector" for the Town and acknowledging that Trejo served as a "building inspector" and was "underneath" him (emphasis added)); Trejo Dep. 7:7–18, 41:3–6 (testifying that Incagliato was her supervisor, assigned her to inspect the Sheas' basement apartment, and "instructed" her to put padlocks on the doors to the structure after she condemned the property).) Moreover, Incagliato: (1) denied that he was Trejo's supervisor and testified that he "never checked on her work," (2) testified that he "stayed away from" Trejo because he was told by Moran "not to bother her" after Incagliato questioned Trejo's time sheet; and (3) admitted that he received complaints about Trejo but "never took them" and instead forwarded the complaints to Moran. (Incagliato Dep. 28:21–31:25, 40:16–17.) This testimony raises a genuine question of material fact as to whether Moran, rather than Incagliato, was actually supervising Trejo's work in the condemnation of properties.

Second, evidence in the record also raises a genuine question of fact as to whether Incagliato and/or Moran made a "conscious choice" to leave Trejo unsupervised. *Amnesty Am.*, 361 F.3d at 128. As noted, Incagliato testified that he "never checked on her work," that he "stayed away from" Trejo, and that he received complaints about Trejo but "never took them"

86

and instead forwarded the complaints to Deputy Town Attorney Moran. (Incagliato Dep. 28:21–31:25, 40:16–17; *see Amnesty Am.*, 361 F.3d at 128 ("[F]ailure to respond to repeated complaints of civil rights violations would be sufficient to establish deliberate indifference . . . ."). This evidence raises genuine questions of material fact as to whether Incagliato and/or Moran made "no meaningful attempt to forestall or prevent" certain conduct by Trejo. *Amnesty Am.*, 361 F.3d at 127.

Third, although it is a close question, the record supports a genuine question of material fact as to whether Incagliato and/or Moran had sufficient "notice" of a "potentially serious problem of unconstitutional conduct" by Trejo "such that the need for corrective action or supervision was 'obvious.'" *Amnesty Am.*, 361 F.3d at 128. Incagliato testified that he "had heard that [Trejo] had been known to violate people's rights" in "other people's opinions" but that he did not "recall checking on anything she ever did." (Incagliato Dep. 41:10–25; *see also* Opp'n at 12 (citing these lines from the deposition).) Incagliato did not testify about the substance of the complaints against Trejo or what rights Trejo was described as violating. Plaintiffs also provide no evidence about what Moran knew concerning the complaints about Trejo described vaguely by Incagliato.

Nonetheless, a reasonable jury could conclude that based on Incagliato's testimony, alongside the other cases brought against the Town, Incagliato and/or Moran had sufficient notice of an "obvious" need for corrective supervision of Trejo in her work condemning residential properties. Although "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice to the city" of constitutional violations by a subordinate employee, *Connick*, 563 U.S. at 62, 63 & n.7, both *Perkowski* and *McCrae* involved alleged conduct by Town employees in condemning residential properties that took place *before*

the events at issue in this action. In the context of a failure-to-supervise theory of *Monell* liability, "[w]hether or not [these] claims had validity" does not matter. *Fiacco*, 783 F.2d at 328. Neither *Perkowski* nor *McCrae* named Trejo as a defendant, but a reasonable jury could conclude they still placed Incagliato and Moran on notice of an obvious need for supervision of Town employees' conduct in condemning residential properties for several reasons.

First, *Amnesty American*, *Reynolds*, and the key Second Circuit cases on which they rely do not require the complaints that place the municipality on notice of an obvious need for supervision to be brought against the *specific defendants* named in the action. *See, e.g., Amnesty Am.*, 361 F.3d at 128; *Reynolds*, 506 F.3d at 193; *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).[29] To the contrary, "[t]he means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular showing." *Amnesty Am.*, 361 F.3d at 128. In *Amnesty American*, this standard was met because the supervisor "himself witnessed (and perhaps encouraged) the unconstitutional conduct." *Id*. Here, *Perkowski* was filed against Incagliato on September 29, 2018—around one month before the conduct at issue in this action—raising a genuine question of material fact as to whether Incagliato and Moran were on notice that Town employees carrying out the condemnation of residential properties required supervision to prevent the violation of the rights of occupants. Complaint, ECF No. 1, *Perkowski*, No. 18-cv-5480. Moreover, a genuine question of material fact exists that this need for supervision became more obvious following *McCrae* since it named Paccione, another town investigator not named in this action, and another building inspector as defendants. *See McCrae*,

---

[29] This makes sense because repeated complaints of civil rights violations against municipal employees may raise an inference that supervisors need to investigate and forestall further incidents by employees in similar positions engaging in similar work.

759 F. Supp. 3d at 381. Although in that action defendants alleged that the plaintiff was a squatter with no legal authority to reside at the subject property, it also involved claims arising from the plaintiff's eviction from his house without opportunity to retrieve his belonging and the subsequent boarding up of the premises. *Id.* at 381–83. Accordingly, a reasonable jury could conclude that *Perkowski* and *McCrae* together placed Incagliato and Moran on notice that complaints regarding conduct "similar to the violation[s] at issue" in this litigation, were also being made against Town investigators and building inspectors, putting both on notice of the need to supervise the conduct of these employees in the condemnation of residential properties and related treatment of occupants. *Connick*, 563 U.S. at 62, 63 & n.7.

Second, although Incagliato did not testify in deposition regarding Trejo's conduct underlying his testimony that she had "been known to violate people's rights," Incagliato Dep. 41:10–25, a reasonable jury could conclude that, in light of *Perkowski* and *McCrae*, Incagliato's testimony raises a genuine dispute of material fact as to whether Incagliato and/or Moran were aware of an "obvious" need for Incagliato or Moran to supervise her work in condemning residential properties and the related treatment of property occupants. *Amnesty Am.*, 361 F.3d at 128.[30]

---

[30] During Incagliato's deposition testimony he did not testify to when he had heard these allegations about Trejo. (Incagliato Dep. 41:10–25.) Nonetheless, on reply, Defendants did not indicate that these statements post-dated the events in question in this action. (Reply at 9–10.) Moreover, because this deposition was taken in *Spradley*, which concerned conduct that occurred only a month after the facts here, a reasonable jury could infer that these opinions were shared with Incaglaito prior to the events at issue here.

Defendants attempt to dismiss these opinions regarding Trejo as "office gossip," and argue that Incagliato effectively supervised Trejo because he lifted the condemnation of Plaintiffs' basement apartment. (Reply at 10.) However, the credibility of these complaints is a question of fact for the jury, and Incagliato's lifting of the condemnation on the basement apartment when

For all of these reasons, evidence in the record raises a genuine dispute of material fact as to whether "the need for more or better supervision to protect against constitutional violations [in Town employees' conduct in the course of condemning residential properties] was obvious." *Amnesty* at 127. As a result, there is a genuine question of material fact as to whether: (1) any supervisor of Trejo "should have known their inadequate supervision was so likely to result in the alleged deprivations so as to constitute deliberate indifference"; (2) there were "obvious and severe deficiencies" in the supervision of Trejo "that reflect a purposeful rather than negligent course of action"; and (3) there existed a "a causal relationship between the failure to supervise and the alleged deprivations to plaintiffs." *Reynolds*, 506 F.3d at 193. Accordingly, summary judgment is denied to the Town on Plaintiffs' *Monell* claims based on a failure-to-supervise theory.

### C.  Failure-to-Train

In "limited circumstances' a municipality may . . . be held liable for its failure to train its employees," although "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61; *see also*. *Hernandez v. United States*, 939 F.3d 191, 206 (2d Cir. 2019). In order to succeed on a *Monell* claim under a failure-to-train theory, a plaintiff must meet three requirements: (1) a showing that the municipality's "failure to train its employees in a relevant respect amount to deliberate inference"; (2) an identification of a deficiency in a city's training program that is "closely

---

Plaintiffs satisfied all of the requirements imposed by Trejo is unrelated to whether and how Incagliato and/or Moran supervised her. Finally, Defendants argue that Trejo has "consistently renewed" her building inspector license and there "have been no complaints filed against" her with the New York State Department of State. (Mot. at 25.) Again, this creates a dispute of fact for the jury to resolve.

90

related to the ultimate injury"; and (3) the existence of a "direct causal link" between the failure to train and the alleged constitutional deprivation. *Hernandez*, 939 F.3d at 206–07.

For purposes of a failure-to-train theory of *Monell* liability, the plaintiff must show that the municipality "was on notice that, absent additional specified training," it was "*so predictable*" that the untrained employee would make a wrong decision that the municipality's failure to train "amounted to *conscious disregard*" for the plaintiff's rights. *Connick*, 563 U.S. at 71 (emphasis in original). As a result, ordinarily a "municipality is deliberately indifferent where it fails to act when it has 'actual or constructive notice,' generally from '[a] pattern of similar constitutional violations by untrained employees,' that its training program is 'deficient.'" *Hernandez*, 939 F.3d at 207 (quoting *Connick*, 536 U.S. at 61).[31]

Here, I need not consider deliberate indifference because Plaintiffs fail to "identify a specific deficiency in the [Town's] training program" that would support a failure-to-train theory of *Monell* liability. *Amnesty Am*, 361 F.3d at 129. Instead, the entirety of Plaintiffs' opposition brief focuses on Incagliato's alleged failure to supervise, which is a separate theory of Monell liability as discussed above.

For all of these reasons, I grant Defendants summary judgment on Plaintiffs' *Monell* claims based on failure-to-train and custom theories, but deny Defendants summary judgment on the *Monell* claims based on a failure-to-supervise theory.

---

[31]The Supreme Court has "left open the possibility" that, although rare, there could exist a case in which the "unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick*, 563 U.S. at 63.

**CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgement (ECF No. 40) is granted in part and denied in part as follows: (1) summary judgment is denied to Trejo on Plaintiffs' claims under Section 1983 and the Fourteenth Amendment challenging the deprivation of Plaintiffs' home and personal property without procedural due process; (2) summary judgment is denied to Trejo on Plaintiffs' claims under Section 1983 and the Fourth Amendment against the alleged unlawful seizures of Plaintiffs' home and personal property; (3) Trejo has not shown that she is entitled to qualified immunity on any claims against her at this stage of the proceedings; (4) summary judgment is granted to Trejo on Plaintiffs' Section 1983 conspiracy claim; (5) summary judgment is granted to Paccione on the claims against her under Section 1983 and the Fourteenth and Fourth Amendments as well as the Section 1983 conspiracy claim; (6) summary judgment is granted to the Town on Plaintiffs' Section 1983 claims for municipal liability under *Monell* based on custom and failure-to-train theories; and (7) summary judgment is denied to the Town on Plaintiffs' Section 1983 claims for municipal liability under *Monell* based on a failure-to-supervise theory.

Dated: Central Islip, New York
      April 8, 2026

                                       */s/ Nusrat J. Choudhury*
                                       NUSRAT J. CHOUDHURY
                                       United States District Judge